UNITED STATES AT THE RELATION OF KANSAS CITY SOUTHERN RAILWAY COMPANY *v.* INTERSTATE COMMERCE COMMISSION.

ERROR TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 413.   Argued December 10, 1919.—Decided March 8, 1920.

The Valuation Act of March 1, 1913, requires the Interstate Commerce Commission to ascertain and report, *inter alia*, the present cost of condemnation and damages or of purchase of the lands, rights of way and terminals of carriers in excess of their original cost or present value, apart from improvements. *Held*, that a refusal of the Commission to receive and act upon evidence to this end was not justified by the supposed impossibility of performing the statutory duty

or the difficulties involved in so doing, and that a railroad company whose interests were affected was entitled to the writ of mandamus. P. 187.

Reversed.

THE case is stated in the opinion.

*Mr. Louis Marshall* and *Mr. Samuel W. Moore*, with whom *Mr. Samuel Untermyer* was on the brief, for plaintiff in error.

*Mr. P. J. Farrell* for defendant in error:

To estimate the present cost of condemnation and damages or of purchase of lands included in plaintiff in error's railroad is impossible, because it necessarily involves unwarrantable and unlawful assumptions.

In the *Minnesota Rate Cases*, 230 U. S. 352, this court entertained the opinion that an estimate of the present cost of acquisition of the lands included in the right of way, yards, and terminals of a carrier could be made only upon the theory that the railroad would be removed before the estimate would be made, and it is apparent that no other theory would be tenable. The court points out that upon the assumption of the nonexistence of the railroad it is impossible for anyone to describe either the conditions that would exist or the exigencies of the hypothetical owners of the property, and says in emphatic language that an attempt to estimate what would be the actual cost of acquiring the right of way under such circumstances would be to indulge in mere speculation. In other words, this court says that what plaintiff in error is asking the court to require the Commission to do cannot, as a matter of law, be done. The court, however, does not stop here. It proceeds to demonstrate why such an estimate cannot be made. It shows that the uses and values of lands in the vicinity of the railroad are largely the result of the construction and operation of the railroad; that it would be

impossible to determine the extent to which such uses and values have been so influenced, and that to assume that they would not be affected if the railroad were removed, and base upon that theory an estimate of reacquiring the lands, or its equivalent, an estimate of the present cost of condemnation and damages, or of purchase, would be improper and unjustifiable and produce a result which could not be accepted as evidence by a court. This court clearly states, in substance, that the estimate of present cost of condemnation and damages, or of purchase, which plaintiff in error is asking the court to compel the Commission to make is an estimate which is wholly beyond reach of any process of rational determination. In this connection it points out that the appraisers of the lands involved in the *Minnesota Rate Cases*, in an attempt to estimate the cost of acquiring the lands, were presented with an impossible hypothesis.

As shown in the answer herein, the evidence introduced before the Commission in connection with the valuation of the lands included in plaintiff in error's railroad establishes that at the time the railroad was constructed a portion of said lands was donated to, and another portion purchased by, plaintiff in error, and that plaintiff in error obtained title to still another portion through condemnation proceedings. It is evident that, upon the assumption of the removal of the railroad and its reproduction, it is impossible to ascertain the portion of said lands which would be so donated, or the portion thereof which would have to be purchased by plaintiff in error, or the portion thereof plaintiff in error would have to acquire title to through condemnation proceedings.

It is further apparent that the removal of the railroad and its immediate reproduction would not damage in any manner or to any extent any of the lands adjoining or adjacent to the railroad or the owners of such adjoining or adjacent lands.

It is also clear that to determine, upon the assumption of the removal of the railroad, that the title to the lands included therein would revert to or be vested in the owners of said adjoining lands, would be unjustifiable and improper.

The court will not, by issuing a writ of mandamus, require something to be done which it is impossible to do. *Silsby Mfg. Co.* v. *Allentown,* 153 Pa. St. 319.

The decision of this court in the *Minnesota Rate Cases* is directly in point and should be given controlling influence. *Chicago & Northwestern Ry. Co.* v. *Smith,* 210 Fed. Rep. 632; *Louisville & Nashville R. R. Co.* v. *Railroad Commission,* 208 Fed. Rep. 35; *Ann Arbor R. R. Co.* v. *Fellows,* 236 Fed. Rep. 387.

This court has approved the Commission's interpretation of the court's decision in the *Minnesota Rate Cases.* See *Denver* v. *Denver Union Water Co.,* 246 U. S. 178.

In finding the present market value of plaintiff in error's common-carrier lands, as measured by the "fair average of the normal market value of lands in the vicinity having a similar character," the Commission must of course consider conditions as they now are, including the existence of the railroad, but in estimating what it would cost to reacquire such lands, that is, the reproduction cost, or the present cost of condemnation and damages or of purchase, of the lands, the Commission would have to treat the railroad as nonexistent and speculate, enter into the realm of mere conjecture, as to what the market value of the lands would be under such circumstances.

Plaintiff in error's contention that it will lose something to which it is entitled, unless the remedy it asks for is applied, is based upon speculation, and is not justified by the facts. It is asking the court to assist it in obtaining for its common-carrier lands a special railway value, in excess of the amount invested in them and beyond the value of similar property owned by others.

*Mr. W. G. Brantley, Mr. Sanford Robinson* and *Mr. Leslie Craven*, by leave of court, filed a brief as *amici curiæ.*

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

The Act of Congress of March 1, 1913, c. 92, 37 Stat. 701, amending the "Act to regulate commerce," imposed the duty upon the Interstate Commerce Commission (§ 19a) to "investigate, ascertain, and report the value of all the property owned or used by every common carrier subject to the provisions of this Act." Specifying the steps to be taken in the performance of the general duties thus imposed, the same section commanded as follows:

"First.   In such investigation said commission shall ascertain and report in detail as to each piece of property owned or used by said common carrier for its purposes as a common carrier   .   .   .   the cost of reproduction new, the cost of reproduction less depreciation, and an analysis of the methods by which these several costs are obtained, and the reason for their differences, if any.   . . . .

"Second.   Such investigation and report shall state in detail and separately from improvements the original cost of all lands, rights of way, and terminals owned or used for the purposes of a common carrier, and ascertained as of the time of dedication to public use, and the present value of the same, and separately the original and present cost of condemnation and damages or of purchase in excess of such original cost or present value.

*       *       *       *       *       *       *       *

"Fifth.   .   .   [7th par.].   Whenever the commission shall have completed the tentative valuation of the property of any common carrier, as herein directed, and before such valuation shall become final, the commission shall give notice by registered letter to the said carrier,   .   .   .   stating the valuation placed upon the sev-

eral classes of property of said carrier, and shall allow
thirty days in which to file a protest of the same with the
commission. . . .

"If notice of protest is filed the commission shall fix a
time for hearing the same, and shall proceed as promptly
as may be to hear and consider any matter relative and
material thereto. . . . All final valuations by the
commission and the classification thereof shall be pub-
lished and shall be prima facie evidence of the value of the
property in all proceedings under the Act to regulate
commerce as of the date of the fixing thereof, and in all
judicial proceedings for the enforcement of the Act ap-
proved February fourth, eighteen hundred and eighty
seven, commonly known as 'the Act to regulate commerce"
and the various Acts amendatory thereof, and in all ju-
dicial proceedings brought to enjoin, set aside, annul, or
suspend, in whole or in part, any order of the Interstate
Commerce Commission."

Pursuant to these requirements the Commission pro-
ceeded to investigate and report the value of the property
of the Kansas City Southern Railway Company. Upon
completing a tentative valuation, the Commission gave
the notice required by the statute to the Railway Com-
pany, which thereupon filed a protest against such valua-
tion on the ground that in making it the Commission had
failed to consider and include the "present cost of con-
demnation and damages or of purchase in excess of such
original cost or present value." Upon the subject of the
protest, the Railway Company took a large amount of
testimony and much was also taken by the Commission,
both parties having incurred considerable expense in the
matter.

Pending this situation, in order that the excessive ex-
pense of taking each individual parcel and showing what
it would cost to acquire it or a right of way over it by pur-
chase or condemnation might be avoided, an agreement

was entered into between the Director of the Bureau of
Valuation of the Commission, C. A. Prouty, and the Rail-
way Company, that in the event the Commission should
decide that evidence upon the cost of acquiring land by
purchase or condemnation would be received by it, the
Bureau of Valuation would recommend to the Commission
the percentage or multiplier of the naked value of the
land, to be used for the purpose of reaching the railway
cost of acquiring the same.

At that time there was also pending a protest concern-
ing a tentative valuation made by the Commission as to
the property of the Texas Midland Railroad Company,
raising the same question as to error committed in failing
to carry out the provisions of the statute concerning the
present cost of condemnation, etc., in which case the Com-
mission overruled the protest, holding that the provision
of the statute in question was not susceptible of being en-
forced or acted upon for reasons stated by the Commis-
sion in part as follows (1 I. C. C. Val. Rep. 54 *et seq.*) :

"However, the direction in paragraph 'Second' for the
ascertainment of the present cost of condemnation and
damages or of purchase in effect calls for a finding as to
the cost of reproduction of these lands. Must this be
done, and can this be done? It seems elementary that
the cost of reproduction can be estimated only by assum-
ing that the thing in question is to be produced again, and
that if it is to be produced again, it is to be taken as not
existent. It seems sophistry to contend that the lands of
the railroad can be produced again at a cost to the rail-
road without first making the assumption that they are
no longer lands of the railroad; and this necessary assump-
tion carries with it the mental obliteration of the railroad
itself.

"Considerable testimony was produced to the effect
that in the acquisition of a railroad right of way it is nec-
essary for the carrier to pay sums in excess of the value of

the land if measured by the present or market value of similar contiguous lands, and this because of the elements which have been enumerated and embraced in the protest, such as cost of acquisition, damages to the severed property, cost of buildings and other improvements, accrued taxes and various incidental rights.

\*     \*     \*     \*     \*     \*     \*     \*

"We are unable to distinguish between what is suggested by the carrier in this record and nominally required by the act and what was condemned by the court [in the *Minnesota Rate Cases*] as beyond the possibility of rational determination; nor is there any essential difference in the actual methods there employed and those now urged upon us. Before we can report figures as ascertained, we must have a reasonable foundation for our estimate, and when, as here, if the estimate can be made only upon inadmissible assumptions, and upon impossible hypotheses, such as those pointed out by the Supreme Court in the opinion quoted, our duty to abstain from reporting as an ascertained fact that which is incapable of rational ascertainment, is clear.

\*     \*     \*     \*     \*     \*     \*     \*

"Because of the impossibility of making the self-contradictory assumptions which the theory requires when applied to the carrier's lands, we are unable to report the reproduction cost of such lands or its equivalent, the present cost of acquisition and damages, or of purchase in excess of present value. The present value of lands as found by us appears in the final valuation, appended hereto."

Applying the ruling thus made to the protest which was pending in this case, the Commission gave notice to the Railway that the agreement made with the Director of the Bureau of Valuation concerning the method of proof would be treated as not further operative; and thereafter when an offer was made by the Railway before an exam-

iner of the Commission of further testimony concerning the subject in hand, it was excluded because in conflict with the ruling announced in the *Midland Case.* The Commission sustained this action of the examiner on the ground that that officer had rightly held that the ruling in the *Midland Case* was controlling; and the Commission therefore decided that no further testimony on the particular subject would be heard in this case, and that it would make no report concerning that subject.

This suit was then brought to obtain a mandamus to compel the Commission to hear the proof and act upon it under the statute. The amended petition, after reciting the facts as we have outlined them and making the appropriate formal averments to justify resort to mandamus, alleged:

"That the refusal of respondent to investigate and find such present cost of condemnation and damages or of purchase in excess of original cost or present value of relator's lands will result in great wrong and injury to relator; by way of illustration, such refusal will result in a finding by respondent of a value of but $60,000 with respect to parcels of land acquired by relator by judicial award in condemnation proceedings during four years immediately preceding such valuation at an actual cost to relator of $180,000; and in the aggregate will result in a finding with respect to said lands at least $5,000,000 less than the value so directed by the Act of Congress above mentioned to be found."

It was further averred, with considerable elaboration, that the petitioner stood ready to produce proof to meet the requirements of the statute which was neither speculative nor impossible to be acted upon, since it would conform to the character of proof usually received in judicial proceedings involving the exercise of eminent domain.

The Commission in its answer, either stating or con-

ceding the history of the case as we have recited it, and summarily reiterating the grounds for the refusal by the Commission to receive the proof or report concerning it, challenged the right to the relief sought. A demurrer to the answer as stating no defense was overruled by the trial court, which denied relief without opinion. In the Court of Appeals, two judges sitting, the judgment of the trial court was affirmed by a divided court, also without opinion, and the case is here on writ of error to review that judgment.

It is obvious from the statement we have made, as well as from the character of the remedy invoked, mandamus, that we are required to decide, not a controversy growing out of duty performed under the statute, but one solely involving an alleged refusal to discharge duties which the statute exacts. Admonishing, as this does, that the issue before us is confined to a consideration of the face of the statute and the non-action of the Commission in a matter purely ministerial, it serves also to furnish a ready solution of the question to be decided, since it brings out in bold contrast the direct and express command of the statute to the Commission, to act concerning the subject in hand, and the Commission's unequivocal refusal to obey such command.

It is true that the Commission held that its non-action was caused by the fact that the command of the statute involved a consideration by it of matters "beyond the possibility of rational determination," and called for "inadmissible assumptions," and the indulging in "impossible hypotheses" as to subjects "incapable of rational ascertainment," and that such conclusions were the necessary consequence of the *Minnesota Rate Cases,* 230 U. S. 352.

We are of opinion, however, that, considering the face of the statute and the reasoning of the Commission, it results that the conclusion of the Commission was erroneous, an error which was exclusively caused by a mistaken

conception by the Commission of its relation to the subject, resulting in an unconscious disregard on its part of the power of Congress and an unwitting assumption by the Commission of authority which it did not possess. And the significance which the Commission attributed to the ruling in the *Minnesota Rate Cases*, even upon the assumption that its view of the ruling in those cases was not a mistaken one, but illustrates in a different form the disregard of the power of Congress which we have just pointed out, since, as Congress indisputably had the authority to impose upon the Commission the duty in question, it is impossible to conceive how the *Minnesota Rate* ruling could furnish ground for refusing to carry out the commands of Congress, the cogency of which consideration is none the less manifest though it be borne in mind that the *Minnesota Rate Cases* were decided after the passage of the act in question.

Finally, even if it be further conceded that the subject-matter of the valuations in question which the act of Congress expressly directed to be made necessarily opened a wide range of proof and called for the exercise of close scrutiny and of scrupulous analysis in its consideration and application, such assumption, we are of opinion, affords no basis for refusing to enforce the act of Congress, or what is equivalent thereto, of exerting the general power which the act of Congress gave, and at the same time disregarding the essential conditions imposed by Congress upon its exercise.

*The judgment of the Court of Appeals is therefore reversed with directions to reverse that of the Supreme Court and direct the Supreme Court to grant a writ of mandamus in conformity with this opinion.*