## NEW YORK, N. H. & H. R. CO. v. INTERSTATE COMMERCE COMMISSION.

### No. 5466.

Court of Appeals of District of Columbia.

Argued Dec. 8, 1931.

Decided Jan. 18, 1932.

John L. Hall and Charles O. Pengra, both of Boston, Mass., and P. Michael Cook, of Washington, D. C., for appellants.

Charles W. Needham, Thomas M. Ross, Robert E. Freer, and Mary B. Linkins, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and VAN ORSDEL, HITZ, and GRONER, Associate Justices.

VAN ORSDEL, Associate Justice.

Pursuant to its authority under the Interstate Commerce Act, the Interstate Commerce Commission, hereafter referred to as the commission, on June 30, 1915, instituted a proceeding known as Valuation Docket No. 301, to ascertain the value of the property owned or used by the New York, New Haven & Hartford Railroad Company, hereafter referred to as the New Haven.

The New Haven took exception to the report of the valuation fixed by the commission and filed a petition in the Supreme Court of the District of Columbia praying that a writ of mandamus issue to compel the commission, in making its final valuation of the property owned and used by the New Haven, to investigate, ascertain, and report the value of its rights in the passenger terminal known as the Grand Central Terminal and approaches thereto in New York City, and the passenger terminal known as the South Station in Boston.

From a judgment in the court below discharging the writ, this appeal was taken.

The New York & Harlem Railroad Company, hereafter referred to as the Harlem, was chartered by the Legislature of New York in 1831, and it constructed a line of railroad from White Plains into New York City. The New York & New Haven Railroad Company was granted a perpetual charter by the state of Connecticut on June 7, 1844, and was authorized to construct its railroad from New Haven to the New York state line. Later it applied to the New York Legislature for the right to extend its railroad from the state line into New York City. This authority was not granted.

■ The two companies, however, entered into an agreement dated January 22, 1846, which was followed by a substituted agreement dated March 17, 1848, which provided, among other things, as follows: "Fourth, It is mutually understood and agreed that when and as soon as the New York and New Haven Railroad Company shall have completed their road from the point of junction by Byram River, they shall have the right to run their trains, engines, and cars for the transportation of passengers, mails, expresses, freight, etc., over the track or tracks of the road of the New York and Harlem Railroad Company from the point of junction aforesaid to and into the city of New York, and as far

over the same in the said city as the said company's road shall extend, not, however, below the intersection of said railroad and Pearl Street in said city—the said New York and New Haven Company furnishing their own haulage." This agreement was to continue in force "during the terms of their charters respectively, and for all renewals thereof." The charter of the New York & New Haven being perpetual, it constituted a grant in perpetuity. People v. O'Brien, 111 N. Y. 1, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684.

The Legislature of New York, by the act of March 29, 1848 (Laws 1848, c. 143), amended the charter of the Harlem as follows: "The New York and New Haven Railroad Company is hereby authorized to enter upon and run their cars and engines for passengers, freights, mails, expresses, and other business, over the road of the New York and Harlem Railroad Company, from the point of junction of the roads of said companies at or near William's Bridge, in the county of Westchester, to the city of New York, and as far into the said city as the said Harlem railroad may extend, upon such terms and to such point as has been or may hereafter be agreed upon by and between said companies; a copy of such agreement or agreements to be duly authenticated and filed in the office of the secretary of state of this state; and to take, transport and convey persons and property upon the said Harlem railroad, by the power and force of steam or animals or any mechanical power or combination of the same." These rights have been enjoyed by the New York & New Haven and its successor, the New Haven, up to the present time.

■ The rights thus acquired by the New York & New Haven under its agreement of 1848 were in the nature of a perpetual easement in the Harlem road. By the filing of the agreement in conformity with the grant of power conferred by the New York Legislature, the easement partook of the characteristics of a franchise whereby the Harlem road was subjected to a right of way, subject only to be terminated by the failure of the New York & New Haven to comply with the terms of its contract. The act of 1848, however, went further than the terms of the easement granted by the agreement of 1848, in that it constituted a public grant or franchise to the New York & New Haven road, and impressed in perpetuity a dominant servitude upon the property of its own corporation, the Harlem. It operated as an amendment of the charter of the Harlem by impressing upon it the ease-

ment granted to the New York & New Haven as a franchise obligation of the Harlem. The amendment of the Harlem's charter operated as a grant of a franchise to a foreign corporation. This established a property right in the New York & New Haven which could not be destroyed even by the termination of the Harlem charter; a franchise right which could only be terminated by the payment of full compensation, under proper authority, to the New York & New Haven.

The perpetual easement and franchise thus acquired and owned by the New York & New Haven, and later transferred to the New Haven, was granted 25 years before the New York Central acquired any rights over the Harlem tracks. The Central's lease by its terms expires 401 years from April 1, 1873. That lease was of all the property and interests of the Harlem. It logically follows that should this lease extend to its termination and the New Haven still be in operation, it would continue to have its rights preserved to operate over these tracks. In other words, the grant to the Central was for a term of years and as one of the conditions of its lease it is subject to the prior and superior perpetual rights of the New Haven.

On November 1, 1872, the Harlem, the Central, and the New Haven entered into a tripartite agreement whereby the Harlem agreed to construct the original Grand Central Depot at Forty-Second street in New York City and lease it to the Central and New Haven companies for the joint use and occupation of the three companies. In this agreement the rights of the New Haven were to continue during the term of its charter, which was perpetual. In the lease of the Harlem in 1873, the Central agreed to perform all the obligations imposed by this tripartite agreement on the Harlem.

This was followed by a further agreement of July 24, 1907, providing for the construction of the present Grand Central Terminal and the operation of its approaches as far north as Fifty-Ninth street in New York. In paragraph 3 of this contract it was provided: "The Central company, acting for itself and the Harlem company, as hereinafter authorized, in consideration of the rents hereinafter reserved to be paid by the New Haven company, and in consideration of the covenants on the part of the New Haven company hereinafter contained, hath demised, let, and leased, and by these presents doth demise, let, and lease unto the New Haven company, during the term of the New Haven company's charter and all renewals thereof, including the charter of any company which shall operate the present railroad of the said New Haven company, the use, in common with the Central company, subject to all the provisions of this agreement, of the said railroad terminal for the accommodation of the traffic of the New Haven company, other than freight traffic; provided, however, that the New Haven company's right to the use thereof shall in no event exceed fifty (50) per centum of the maximum capacity of said railroad terminal, or of any part thereof."

The contract provided, as compensation for the rights thus acquired by the New Haven, that it should pay its proportion of the interest on the cost of construction of the original Grand Central Depot, and a proportion of the annual expenses for maintenance and operation of the present Grand Central Station. The contract further provided that the New Haven could not assign this lease without the consent of the Central and that in case of any default on the part of the New Haven to comply with the terms of the agreement for a period of sixty days, the Central should have the right to "enter into and upon said premises and repossess itself thereof."

The contract further provided that the railroad terminal should be under "the sole charge and direction of a terminal manager, who shall be appointed in writing by the presidents of the Central and New Haven companies, and shall be removable at any time upon written notice by either of said presidents." The agreement was to remain in force not only during the term of the New Haven's charter but of any renewals thereof or the charter of any company which may hereafter operate the New Haven company's railroad.

In the case of Georgia v. Cincinnati Southern Railway, 248 U. S. 26, 39 S. Ct. 14, 15, 63 L. Ed. 104, where the state of Georgia granted to the trustee of the Cincinnati Southern Railway, for the use of the railway, a portion of the right of way of the Western & Atlantic Railroad between certain points, with the provision "that this grant is subject to the consent and approval of the lessees of the Western & Atlantic Railroad as to the term of their lease," the state by statute undertook to repeal the act on the ground that it granted a license only. Construing the effect of this grant, the court, speaking through Mr. Justice Holmes, said: "A grant of the use of a right of way is the grant of a right of way in the ordinary meaning of words, and a grant of a right of way to a corporation or to perpetual trustees holding for the corporate uses does not need words of succession to

be perpetual. The words 'and its successors' or 'in fee' would not enlarge the content of a grant to a corporation."

That the New Haven was granted the possession and use of an undivided interest in the terminal property not exceeding 50 per cent. thereof, upon the continued compliance with the terms of the contract, was emphasized by the language used in paragraph 8 in which the Central covenants and agrees "that the New Haven company, paying the rent and sums of money hereinbefore mentioned and performing the covenants and agreements aforesaid on its part to be performed, shall and may at all times during the term hereby granted, peaceably have, hold, and enjoy the premises herein demised to it, without any manner of trouble or hindrance of or from the Central company or anyone claiming under it."

From the foregoing it is apparent that the New Haven company acquired most valuable property and franchise rights in the use and operation of the railroad and terminal which are entitled to consideration in the fixing of a valuation upon all its property and its property rights.

A case closely analogous to the one at bar is Proprietors of Locks and Canals v. Boston & Maine Railroad, 245 Mass. 52, 139 N. E. 839, 840. In that case there was a lease to a railroad company during its continuance or until the commonwealth purchased the railroad, a power the state had reserved to itself in granting the charter, or until default in payment of rent. The court, considering the effect of the lease, said: "The habendum clause shows that the leases are for an indefinite term. They are to continue until the happening of one of several events and then to cease. The crucial event may happen at any time, or it may never happen. The leases, therefore, may never come to an end. The effect of the words used was to convey a base fee." In the case at bar the lease extends during the life of the perpetual charter of the New Haven company or the charter of any company operating its present railroad. It could only be terminated by the failure of the New Haven to comply with the terms of its agreement, or in default of payment of rent. As said in the above case: "They are to continue until the happening of one of several events and then to cease. The crucial event may happen at any time, or it may never happen." It follows, we think, from this analogy, that the New Haven has a base fee in the undivided half of the railroad terminal and its approaches.

The case of Union Pacific Railway Company v. Chicago, Rock Island & Pacific Railway Company, 163 U. S. 564, 16 S. Ct. 1173, 1180, 41 L. Ed. 265, held by the court below to be decisive of this case, has little or no bearing on the issues here presented. The question there involved was the validity of a contract between the Pacific company and the Rock Island for trackage rights over the bridge of the Pacific company across the Missouri river, and the approaches thereto, between Council Bluffs, Iowa, and Omaha, Neb. The question the court was called upon to decide was whether or not the contract was one which involved the surrender of the exercise of its franchises by the Pacific company, enjoying grants from the federal government.

The case was decided in 1896, several years before the valuation provisions of the Interstate Commerce Act were enacted. No question of valuation was involved, nor was the Interstate Commerce Commission a party, directly or indirectly. By the terms of the contract, all trains of the Rock Island were to be "moved under the immediate direction of the superintendent or other officer of the lessor company." It also provided that the Rock Island trains coming upon the Pacific tracks immediately passed from the control of the Rock Island company into that of the Pacific and its officials were subjected to the orders of the Pacific officers.

The court held that the contract "was really an agreement for trackage rights, for running arrangements,—a 'terminal contract' with compensation on a 'mileage' or 'wheelage basis,' rather than a lease. * * * By the contract the Pacific Company parted with no franchise, and was not excluded from any part of its property or the full enjoyment of it. What it agreed to do was to let the Rock Island into such use of the bridge and tracks as it did not need for its own purposes." In other words, that it granted merely trackage rights.

We are here dealing with a lease of an operating interest in the use of the Harlem road, and a one-half operating interest and control of the Grand Central Terminal. The position of the New Haven, unlike that of the Rock Island, is not subordinate to, but rather coextensive with, that of the Harlem, for each may absorb the use of the entire tracks subject only to the preference awarded to the express trains of each over the local trains of the other. The New Haven may use 50 per cent. of the trackage and facilities of

the terminal at all times despite the desire of the Central to use more than 50 per cent.

For the purposes of valuation, we are unable to make any material distinction between the New York terminal and the Boston terminal. In 1896 the Legislature of Massachusetts (St. Mass. 1896, c. 516) incorporated the Boston Terminal Company with power to construct and maintain a union passenger station in the city of Boston, and to provide adequate terminal facilities for the several railroads using the terminal and authorized to hold stock in the terminal company. The capital stock was fixed at $500,000 and it was provided that each of five railroad companies, of which the New Haven was one, should subscribe for 20% of the stock, to be paid in cash, and which should constitute the capital stock of the terminal company.

It was further provided that the railroad companies, upon the completion of this station and terminal should use the same for all of their terminal passenger business in Boston. The companies using the terminal were required to pay to the terminal company for such use, in monthly payments, "such amounts as may be necessary to pay the expenses of its corporate administration and of the maintenance and operation of said station, and of the facilities connected therewith and owned by said terminal company, including insurance and all repairs, all taxes and assessments which may be required to be paid by said terminal company, the interest upon its bonds or other obligations issued under the provisions of this act as the same shall become payable, and a dividend, not to exceed 4% per annum upon its capital stock. Each of said railroad companies shall pay for such use of said station and facilities in the proportion in which it has the use thereof."

It was also provided that the proportion of use of the several companies should be fixed by agreement between them, and that the terminal company should pay a franchise tax to the Commonwealth upon the market value of its capital stock, but that the real estate required by the act to be used by the railroad companies should be assessed to and the taxes thereon paid by the companies, and "in the assessment of franchise taxes upon said railroad companies, each of them shall be deemed to be the owner of said real estate in the proportion in which it then has the use thereof under this act."

In other words, the terminal company was little more than a holding corporation for the various railway companies interested. The railway companies were designated in the charter as the stockholders of the terminal company. They were the terminal corporation to whom the State had granted the franchise. They assumed the obligation of constructing the terminal as well as its maintenance and operation. The terminal corporation as such, assumed no liability either in construction, maintenance, operation, or otherwise. Looking through the corporate shell of the terminal company, the real owners, the railway companies, can be seen. It is similar to a one-man corporation except that here there is not even the necessity for voting shares.

It will be observed that the proportion of use of the terminal which a road may acquire is not measured by the amount of capital stock it owns. At the time of bringing this action, through rights acquired from other roads, the New Haven had 75% of the use of the terminal and the New York Central 25%, while the New Haven is the owner of 80% of the stock. The court below held that the value of the property is reflected by the value of the stock and the mere ownership of the stock carries with it the right to use the terminal. In other words, the court held that the value of the use could not be separated from the value of the stock or separately valued.

We are not impressed with this view. The act granted the New Haven the charter right to use a certain proportion of the property of the terminal company. This grant was perpetual in duration and constitutes an interest in the property itself. We think that the rights of the company to the use of the terminal facilities are separate and independent from the mere ownership of stock in the terminal company. Capital stock in a railroad company is not "railway property held for and used in the service of transportation" within the meaning of the Interstate Commerce Act. The stockholders in a railroad company are not the corporation to the extent of possessing the corporate authority to maintain and operate a railroad. The corporation is a distinct and separate entity and its property is distinct and separate from its capital stock. The owners of certificates of the capital stock are mere shareholders entitled to participate in dividends and distribution of the proceeds of the property in the event of dissolution. The property rights of the New Haven to be valued by the commis-

sion are not measured by the capital stock it holds in the terminal company, but by the ownership and perpetual right of use it has acquired in the terminal tracks and station.

This brings us to a consideration of the duty imposed upon the Interstate Commerce Commission in placing a valuation upon the property of the New Haven road. The Act of Congress of March 1, 1913 (37 Stat. 701), amendatory of the original commerce act of February 4, 1887 (24 Stat. 379), contained a section (section 19a) which was later incorporated without change into the Interstate Commerce Act of February 28, 1920 (41 Stat. 493), amended by the Act of June 7, 1922 (42 Stat. 624), and incorporated as amended in the transportation section of United States Code Annotated (section 19a, tit. 49). It was under the provisions of this act that the present valuation was made.

Section 19a, par. (a), provides that "The commission shall, as hereinafter provided, investigate, ascertain, and report the value of all the property owned or used by every common carrier subject to the provisions of this chapter." It further provides that the commission shall make an inventory, listing the property, showing the value thereof, and classifying the physical property as nearly as practicable in conformity with the classification of expenditures for road and equipment.

Paragraph (b) first, requires the commission to ascertain and report in detail each piece of property owned or used by the carrier, the original cost to date, the cost of reproduction new, the cost of reproduction less depreciation, together with an analysis of the methods by which these several costs are obtained. The commission was also required to report separately other values and elements of value, if any of the property, and an analysis of the methods of valuation employed. It also provided, in paragraph (b) second, that "such investigation and report shall state in detail and separately from improvements the original cost of all lands, rights of way, and terminals owned or used for the purpose of a common carrier, and ascertained as of the time of dedication to public use, and the present value of the same."

The act provides in detail the methods to be employed by the commission in ascertaining this valuation and then provides as follows: "All final valuations by the commission and the classification thereof shall be published and shall be prima facie evidence of the value of the property in all proceedings under this chapter as of the date of the fixing thereof, and in all judicial proceedings for the enforcement of this chapter, and in all judicial proceedings brought to enjoin, set aside, annul, or suspend, in whole or in part, any order of the Interstate Commerce Commission."

It will be observed that the power vested in the commission in making valuations is unlimited in scope. It requires a valuation of all property "owned or used" by the carrier. In providing for this comprehensive valuation, the object sought by Congress was to establish a prima facie value of all the property owned and used by the carrier.

The commission's refusal to value the interest of the New Haven in the terminals in question and the approaches is set forth in their report as follows: "To report this property for the purpose of rate making either as property owned and used or used but not owned by the carrier would result in a duplication. The right to use these extensive terminal facilities is a commercially valuable contract right owned by the carrier, and this joint use thereof is also a valuable asset to the owning company. But for the purpose of ascertaining the value, for rate-making purposes, of the carrier's property owned or used in common-carrier service, no specific value will be reported for the right of the carrier to the use of this property. We sustain the omission from the tentative valuation of the reproduction cost of this property and a finding of the value of the right to use it."

This states clearly the position of the commission in refusing to fix a valuation upon the ownership and use of the New Haven company in this property. This we think was clearly erroneous. It places a limitation upon the requirements of the act which is not justified. The commission made this finding notwithstanding its recognition of value in the report as follows: "We do recognize that the advantages to the carrier of these rights are valuable and essential to the operation of its property as a whole. Nevertheless, for the purpose of finding a rate base, it is distinguished only by its magnitude from the many other similar rights of carriers to the joint use of property wholly owned by other carriers."

After considering the provisions of the statute and the leases and agreements of the respective companies, the commission arrived at the conclusion that: "It is therefore not necessary for us to determine whether the right of use in the carrier is best defined by

reference to it as a license to use, an easement, or a trackage right." This totally ignored the right of the New Haven company to have its "property" which it both "owned" and "used" valued under the mandate of section 19a (a) where the commission is expressly required to report the value of "all the property owned or used by every common carrier."

The commission in fixing the valuation in this case seems to have confined it to what it calls a "value for rate-making purposes," but this is only one of a number of objects for which the final valuation is made prima facie evidence of the value of all the property. Section 5 of the Interstate Commerce Act (49 USCA § 5) requires that the commission prepare and adopt a plan of consolidation of all of the railway properties, and paragraph (6) (b) of that section provides that "the value of the properties sought to be consolidated shall be ascertained by the commission under section 19a of this chapter. * * *" The act also provides that the valuation thus fixed shall be available for ascertaining the operating income of the railways under what is known as the recapture clause of the act. Also for the purpose of division of joint rates and issuance of securities.

It is apparent, therefore, that the establishment of a base for the fixing of rates is merely one of a number of objectives to be attained through this valuation. Nowhere in the act is there anything that either expressly or by inference can be distorted into the limitation of this valuation for rate-making purposes. The statute, on the contrary provides that it shall be a valuation of all the property of the railway company.

We must not be understood as holding that the valuation of the New Haven property fixed by the commission is not a proper valuation for rate-making purposes. This is a matter we are not called upon to decide. The statute requires a valuation of all the property "owned or used" by the carrier which shall be prima facie evidence for any and all purposes specified in the act and not merely for the purpose of establishing a rate base.

Whatever, therefore, may be the proper basis of considering the valuation for the purpose of finding a rate base, the valuation required by the statute cannot be subjected to any such limitation. Whether the use be a joint use of property owned by other carriers or not, it is impressed with a value that must be considered by the commission in arriving at a proper valuation of the property of the carrier under the terms of this act.

We now come to the remedy. Appellant contends that the refusal of the commission to place a valuation upon the property in question constitutes a breach of a ministerial duty imposed upon it by statute. The commission, on the other hand, contends that in the valuation proceedings it necessarily had to consider and act adversely to appellant's contention in respect of the question here under consideration, and that in ascertaining and reporting the value of the property owned by the New Haven, the commission had to interpret the language of the statute respecting property owned or used and to exercise its discretion therein.

The interpretation of a statute by the commission refusing to perform a ministerial act which is clearly imposed is not such an exercise of discretion that it cannot be controlled by mandamus. This same argument was advanced by counsel for the commission in the case of Interstate Commerce Commission v. Humbolt Steamship Co., 224 U. S. 474, 32 S. Ct. 556, 56 L. Ed. 849, where the commission refused to fix steamship rates in Alaska, but the court compelled by a writ of mandamus the assumption of jurisdiction. There is a well-defined distinction between the refusal to perform a ministerial act and its performance in an erroneous way. For mere error in the performance of a statutory duty, the official discretion erroneously exercised cannot be corrected by mandamus, but refusal to act amounts to a refusal to assume jurisdiction. The commission may always be required by the writ of mandamus to take jurisdiction of a statutory duty requiring official decision or action.

True, a valuation of property was here made by the commission, but it was an erroneous valuation, not occasioned through error in the determination of the aggregate value of all the property owned and used by the New Haven company, but by the express refusal of the commission to place any value whatever upon a very important and valuable portion of the property owned and used by the company. This error did not result from erroneous valuation, but from a total lack of valuation as to the property involved. This distinguishes the case of United States ex rel. Kansas City Southern Ry. Co. et al. v. Interstate Commerce Commission, 55 App. D. C. 389, 6 F.(2d) 692, 694, strongly relied upon by the commission, from the case at bar. There the commission valued all the

property of the carrier; here it refused to value certain of the property. This distinction is clearly stated in the opinion of the court, as follows: "Nevertheless it is manifest that the Commission fully assumed and exercised the authority or jurisdiction imposed upon it by the act, and that the real complaint of the appellants is, not that the Commission refused to consider the points in question, but that it considered them and thereupon decided them erroneously. The real relief sought by the appellants, accordingly, is that the valuation reported by the Commission be set aside, and other valuations ordered. This clearly brings the case within the well-established rule that the action of mandamus can not be used as a substitute for an appeal, nor as a writ of error."

The commission in its report discloses complete nonaction on the matter of the valuation of this property. It expressly finds that such valuation is not necessary for the purpose of establishing a rate base. In other words, the commission refused to assume jurisdiction of an express statutory duty imposed upon it by Congress.

In Kansas City Southern Ry. Co. v. Interstate Commerce Commission, 252 U. S. 178, 40 S. Ct. 187, 64 L. Ed. 517, the court interpreted the language of the act requiring the commission to value "all the property owned or used by every common carrier" as a "direct and express command." Subdivision (a) of section 19a of the act, directing the listing of the property, we think clearly refers to all property, whether physical or incorporeal, since it specifically points out the way in which the "physical property" shall be classified.

It is elementary that the commission may be compelled to assume jurisdiction of a duty imposed upon it by law. It is not within the power of the court in issuing a writ of mandamus under those circumstances to undertake to say to the commission how it shall decide the matter, but merely that it shall assume jurisdiction and decide it. Here are valuable property rights, alleged to be such by the commission, upon which no valuation has been placed in arriving at the aggregate value of the property owned and used by the New Haven road.

We think this case is controlled by the decision in Kansas City Southern Ry. Co. v. Interstate Commerce Commission, 252 U. S. 178, 40 S. Ct. 187, 189, 64 L. Ed. 517. In that case the commission completed a tenta-

tive valuation of the property and gave notice to the carrier. The carrier filed a protest on the ground that in making the valuation the commission had failed to consider and include "the present cost of condemnation and damages or of purchase in excess of such original cost or present value." The commission decided that it would not report the reproduction cost of acquiring land, the present cost of acquisition and damages, or of purchase in excess of present value, because of the impossibility of ascertaining the same. A petition for mandamus was filed in the Supreme Court of the District of Columbia to compel the commission to hear proof and act upon it under the statute. The court dismissed the petition without opinion and the Court of Appeals affirmed the judgment by a divided court.

The Supreme Court, reversing these judgments and directing the issuance of the writ, in the course of its opinion said: "It is obvious from the statement we have made, as well as from the character of the remedy invoked, mandamus, that we are required to decide, not a controversy growing out of duty performed under the statute, but one solely involving an alleged refusal to discharge duties which the statute exacts. Admonishing, as this does, that the issue before us is confined to a consideration of the face of the statute and the nonaction of the Commission in a matter purely ministerial, it serves also to furnish a ready solution of the question to be decided, since it brings out in bold contrast the direct and express command of the statute to the Commission to act concerning the subject in hand, and the Commission's unequivocal refusal to obey such command. * * * Finally, even if it be further conceded that the subject-matter of the valuations in question which the act of Congress expressly directed to be made necessarily opened a wide range of proof and called for the exercise of close scrutiny and of scrupulous analysis in its consideration and application, such assumption, we are of opinion, affords no basis for refusing to enforce the act of Congress, or what is equivalent thereto, of exerting the general power which the act of Congress gave, and at the same time disregarding the essential conditions imposed by Congress upon its exercise."

Inasmuch as the statute requires the commission to investigate and report in detail and separately from improvements, the original cost of all lands, rights of way, and terminals owned or used for the purposes of

the common carrier, we think that the commission's failure to comply with the command of the statute in this case is not an exercise of discretion but a refusal to act. It was not an error of decision but an absence of decision.

It is true that the commission took jurisdiction of the valuation of the New Haven road, and had they valued all its property, whatever error or mistake they may have made could not be corrected in this proceeding. They only assumed jurisdiction, however, to value a part of the property, segregating specific well-defined portions of the road which they refused to value. It is therefore not mistaken action but nonaction of which the appellant complains.

The failure to take jurisdiction is emphasized in the commission's report, wherein it states: "In our finding of value in the property owned or used in common carriage service for rate-making purposes we are of opinion that no specific sum should be found for the carrier's right to use these tracks."

This amounted to a refusal on the part of the commission to assume jurisdiction of a specific duty imposed upon it by Congress, and it is clearly the function of mandamus to compel the commission to assume such jurisdiction. Interstate Commerce Commission v. Humbolt S. S. Co., supra. Nor is it necessary that there should be a refusal by the commission to assume jurisdiction of the whole subject-matter committed to it in order to authorize the issuance of the writ. It is sufficient if the refusal extends to any material part of the duty imposed by law.

As the court said in United States v. Los Angeles & Salt Lake Railroad Company, 273 U. S. 299, 310, 47 S. Ct. 413, 414, 71 L. Ed. 651: "In directing the Commission to investigate the value of the property of the several carriers Congress prescribed in detail the subjects on which findings should be made, and constituted the 'final valuations' and 'the classification thereof' prima facie evidence, in controversies under the Act to Regulate Commerce. Every party in interest is, therefore, entitled to have and to use this evidence; and the carrier, being a party in interest, has the remedy by mandamus to compel the Commission to make a finding on each of the subjects specifically prescribed. Kansas City Southern Ry. Co. v. Interstate Commerce Commission, 252 U. S. 178, 40 S. Ct. 187, 64 L. Ed. 517."

The judgment is reversed.