**AMERICAN TRUCKING ASS'NS, Inc., et al. v. UNITED STATES et al. (ANDREWS, Administrator of Wage and Hour Division of United States Department of Labor, Intervener).**

No. 3200.

District Court of the United States for the District of Columbia.

Dec. 4, 1939.

J. Ninian Beall and Albert F. Beasley, both of Washington, D. C., for plaintiffs.

Frank Coleman, Nelson Thomas, John E. Skilling, and Irving J. Levy, all of Washington, D. C., for defendants.

Before GRONER, Chief Justice, United States Court of Appeals for the District of Columbia, and BAILEY and LETTS, Justices, District Court of the United States for the District of Columbia.

GRONER, C. J.

The main question we have to answer is whether defendant, Interstate Commerce

Commission, has jurisdiction and power under Sec. 204(a) (1) and (2) of the Motor Carrier Act of 1935 [1] to establish reasonable requirements with respect to qualifications and maximum hours of service for all employees of common and contract carriers by motor vehicle.

Plaintiff, American Trucking Associations, Inc., is an organization of motor carriers subject to regulation under the Act, and its principal place of business is in the District of Columbia. The other plaintiffs are common carriers by motor vehicle in interstate commerce, likewise subject to regulation.

The Motor Carrier Act, which is Part II of the Interstate Commerce Act, [2] contains a declaration of policy, as follows:

"Sec. 202 [§ 302]. (a). It is hereby declared to be the policy of Congress to regulate transportation by motor carriers in such manner as to recognize and preserve the inherent advantages of, and foster sound economic conditions in, such transportation and among such carriers in the public interest; promote adequate, economical, and efficient service by motor carriers, and reasonable charges therefor, without unjust discriminations, undue preferences or advantages, and unfair or destructive competitive practices; improve the relations between, and coordinate transportation by and regulation of, motor carriers and other carriers; develop and preserve a highway transportation system properly adapted to the needs of the commerce of the United States and of the national defense; and cooperate with the several States and the duly authorized officials thereof and with any organization of motor carriers in the administration and enforcement of this part [chapter]."

The duties and powers of the Commission are described in Sec. 204(a):

"(1) To regulate common carriers by motor vehicle as provided in this part [chapter], and to that end the Commission may establish reasonable requirements with respect to continuous and adequate service, transportation of baggage and express, uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment.

"(2) To regulate contract carriers by motor vehicle as provided in this part [chapter], and to that end the Commission may establish reasonable requirements with respect to uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment.

"(3) To establish for private carriers of property by motor vehicle, if need therefor is found, reasonable requirements to promote safety of operation, and to that end prescribe qualifications and maximum hours of service of employees, and standards of equipment. In the event such requirements are established, the term 'motor carrier' shall be construed to include private carriers of property by motor vehicle in the administration of sections 204 [304] (d) and (e), 205 [305], 220 [320], 221 [321], 222 [322] (a), (b), (d), (f), and (g), and 224 [324] of this part [chapter]."

Shortly after the passage of the Act, the Commission established qualifications and maximum hours for drivers of motor vehicles operated by common and contract carriers. [3] It left undecided the extent of its jurisdiction over other employees. Subsequently, and after the passage in 1938 of the Fair Labor Standards Act, [4] the Commission again instituted proceedings to determine the previously undetermined extent of its jurisdiction. It concluded that its power over employees was limited to the promotion of safe operation, in consequence of which it had jurisdiction to establish hours of work and qualifications of drivers, but of no other employees. [5]

Plaintiffs filed their petition June 9, 1939, asking the Commission to hear evidence and establish regulations as to all employees. The Commission declined to do so, adhered to its former ruling, and declared that any further consideration would be futile, since it had no power to do the things asked. This action was then begun against the United States and the Commission. The Administrator of the Wage and Hour Division was allowed to intervene.

Jurisdiction of the court is conceded. Sec. 205(h) of the Motor Carrier Act; Interstate Commerce Comm. v. United States ex rel. Humboldt Steamship Co., 224

---

[1] 49 Stat. 543, 49 U.S.C.A. § 301 et seq.
[2] 49 U.S.C.A. § 1 et seq.
[3] Ex parte MC–2, 3 M.C.C. 665, 690, 6 M.C.C. 557, 11 M.C.C. 203.

[4] 52 Stat. 1060, 29 U.S.C.A. § 201 et seq.
[5] Ex parte MC–28, 13 M.C.C. ——.

U.S. 474, 32 S.Ct. 556, 56 L.Ed. 849; United States ex rel. Louisville Cement Co. v. Interstate Commerce Comm., 246 U.S. 638, 38 S.Ct. 408, 62 L.Ed. 914; United States ex rel. Kansas City So. Ry. v. Interstate Commerce Comm., 252 U.S. 178, 40 S.Ct. 187, 64 L.Ed. 517.

██ At the hearing counsel stated that, if the Act be construed as plaintiffs insist, the Commission will have to prescribe qualifications and hours for stenographers, clerks, accountants, mechanics, solicitors, and other employees of whose duties and qualifications it has no special knowledge; in this function its determination would not be based upon considerations of transportation—on which it is held to be expert—but upon social and economic considerations, matters on which it is not qualified or equipped, and which would entail the performance of a duty wholly foreign to its normal activities. But even if this be granted, we think there is no doubt that Congress had the power to impose the challenged duty. And the answer to the query cannot be found in the fact of inconvenience to the Commission,[6] but must be first looked for in the language of the statute. If the words are clear, there is no room for construction.

"To search elsewhere for a meaning either beyond or short of that which they disclose is to invite the danger, in the one case, of converting what was meant to be open and precise, into a concealed trap for the unsuspecting, or, in the other, of relieving from the grasp of the statute some whom the Legislature definitely meant to include." Van Camp & Sons Co. v. American Can Co., 278 U.S. 245, 253, 49 S.Ct. 112, 113, 73 L.Ed. 311, 60 A.L.R. 1060.

██ ██ This rule has been applied even where the literal meaning leads to a hard or unexpected result. Crooks v. Harrelson, 282 U.S. 55, 60, 51 S.Ct. 49, 75 L.Ed. 156; Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 333, 59 S.Ct. 191, 83 L.Ed. 195. Statutes have been annulled by construction only where the effect of giving the words their clear meaning would "offend the moral sense * * * [involve] injustice, oppression, or absurdity". United States v. Goldenberg, 168 U.S. 95, 103, 18 S.Ct. 3, 4, 42 L.Ed. 394; Van Camp & Sons Co. v. American Can Co., 278 U.S. 245, 253, 254, 49 S.Ct. 112, 73 L.Ed. 311, 60 A.L.R. 1060.

Guided by this rule, we find that Congress in the first section of the Act declared the definite policy to regulate motor transportation (1) so as to foster sound economic conditions in the public interest; (2) to promote adequate, economical, and efficient service and reasonable charges; (3) to prevent unjust discriminations, undue preferences or advantages; (4) to avoid destructive competition; (5) to coordinate transportation by motor carriers and other carriers; (6) to develop and preserve a highway transportation system· adapted to the needs of commerce and the national defense. The stated objects demonstrate beyond question that Congress has preempted the entire field. To the achievement of the ends sought, Congress provided that it should be the duty of the Commission to regulate carriers by establishing reasonable requirements with respect to (a) service; (b) transportation of baggage and express; (c) uniform systems of accounts, records, and reports; (d) qualifications and maximum hours of service of employees; (e) safety of operation and equipment.

██ In (d) the word "employees" is inclusive. There is nothing in its use or in its relation to other words in the section which, considered in the ordinary sense, can be said to indicate only a particular class of employees. If Congress had intended to distinguish between those employees engaged in the actual operation of motor vehicles and those engaged in other work, it could have done so, as it did in a former statute,[7] by the addition of less than half a dozen words. Hence, to read that limitation into the section would be not only to disregard the letter of the law but to find, without guide or compass in the Act, a legislative intent to that end. To the contrary, such guide as there is—outside the distinct and definite meaning of the words—supports the view that Congress used the language of the section advisedly, and meant precisely what it said. For the third paragraph of Sec. 204, which concerns *private* carriers, expressly limits the power of the Commission over qualifications and hours to those

---

[6] United States ex rel. Kansas City Southern R. Co. v. Interstate Commerce Comm., 252 U.S. 178, 40 S.Ct. 187, 64 L.Ed. 517.

[7] In the Hours of Service Act, 34 Stat. 1415, 45 U.S.C. § 61, 45 U.S.C.A. § 61, Congress by definition limited the word "employees" to "persons actually engaged in or connected with the movement of any train".

employees whose work relates to safety of operation. This distinction between the two classes of carriers is convincing of a definite purpose, and the reason for it is obvious: private carriers are defined to be persons who transport for themselves— in furtherance of a commercial enterprise —or as bailees, their own or another's property in interstate commerce.[8] As to such carriers, Congress properly concluded that to bring *all* their employees under the Commission's jurisdiction—as well those engaged in the manufacturing or commercial end of the business, and having in themselves no direct relation to motor transportation—would create an anomalous situation, as it would.

■ Unless what has been said is incorrect, nothing remains except to ascertain whether, in giving effect to the words of the statute, we create a situation so "glaringly absurd" as to impel the conclusion Congress could not have intended such a result. With due deference to the dilemma of the Commission we are unable to say that this is true. At the time of the passage of the statute, the Fair Labor Standards Act had not been passed or even considered by Congress, but there was in effect a law known as the "National Industrial Recovery Act",[9] under which codes were established to regulate the hours of service of all classes of employees of motor carriers. The Motor Carrier Act expressly provided that it should supersede the provisions of the former codes.[10] There was also in effect in a majority of the states some sort of legislation covering, with diversity of detail and lack of uniformity, hours of service of employees, including drivers of motor vehicles. It it not unreasonable, in these circumstances, to assume that Congress, aware of the problem as it applied to interstate commerce and the advisability of uniformity, chose to place upon the Commission the details of its solution. Certainly, aside from the consumption of the Commission's time, there is nothing glaringly absurd in this, nor reason to suppose a better agency could be found for the purpose. The Commission's fear that it may be called upon

to establish qualifications for executive officials, solicitors, and lawyers, is overstrained. None of these classes is within the category of "employees" as that word is used in public service or labor legislation. The hearings before the committees of Congress developed that the percentage cost of labor was equal to nearly half the total gross revenue of motor carriers, and the special attention of Congress was directed by representatives of the unions to the labor aspect as applied to the problems of uniformity and stabilization, because of widely diversified business organization, absence of labor organization in some regions, and the claimed unreasonable practices of many operators.

And it is easy to see that stabilization of labor conditions as applied to this industry is an important, and indeed a necessary, part of the establishment of rates and general business regulation, matters as to which the Commission admittedly is expert, and these objectives appear as part and parcel of the purposes of the legislation. In this aspect, it is reasonable to conclude that Congress had them in mind when later, upon the passage of the Fair Labor Standards Act, it provided specifically that Sec. 7 thereof[11]—which establishes maximum hours of service— should not apply "with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 [304 of Title 49] of the Motor Carrier Act, 1935, or (2) any employee of an employer subject to the provisions of Part I of the Interstate Commerce Act." 29 U.S.C.A. § 213(b). The necessity of separate provisions for the exemption of employees of the two classes of carriers is manifest. There are no private carriers by rail subject to the Commission's jurisdiction. Congress, therefore, used inclusive language as to the employees of railroads. There are, however, many private motor carriers who are subject to a limited regulation by the Commission, and this is true for reasons which we have already explained. Their em-

---

[8] Sec. 203(a)(17). The term "private carrier of property by motor vehicle" means any person not included in the terms "common carrier by motor vehicle" or "contract carrier by motor vehicle", who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise.

[9] 48 Stat. 195, 15 U.S.C.A. § 701 et seq.

[10] Sec. 204(b), 49 U.S.C.A. § 304(b).

[11] 29 U.S.C.A. § 207.

ployees not subject to the jurisdiction of the Commission would, by the use of the language employed in the case of railroads, have been left ouside of the provisions of the Fair Labor Standards Act. It was obviously the recognition of this fact alone that induced the use of different language in each instance.

In the view we take, the language of the disputed section is so plain as to permit only one interpretation, and we find nothing in the Act as a whole which can with any assurance be said to lead to a different result. The circumstances under which the section was placed in the bill may possibly have created a situation not contemplated by its sponsors, but to say that this is true would be pure speculation, in which we have no right to indulge and upon which we can base no conclusion. We are, therefore, obliged to hold that the Commission was mistaken in limiting its powers to the drivers of trucks and buses.

A secondary question remains to be discussed. The intervener says that, if the statute be read literally, it is unconstitutional because it lacks the necessary legislative standard of qualifications or of service hours for application by the Commission. The rule announced in Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S. Ct. 241, 79 L.Ed. 446, is cited to sustain this contention. But we think the standard established in the Act sufficient to escape the condemnation of the rule applied in that case. Even there the Supreme Court was careful to point out that legislation must often be adapted to complex conditions involving a host of details with which the national legislature cannot deal directly. The Constitution, the Court said, has never been regarded as denying to Congress the necessary resources of flexibility and practicality which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits.

Prior to the passage of the Motor Carrier Act regulation of employees of motor carriers had been exhaustively dealt with under the N.I.R.A. code, and there had been about two years of experience in operating under these codes. There were also the standards set up by the states, and there was the express provision in the statute that the Commission should, in setting up the new order, establish only reasonable requirements. The Commission itself found in this delegation a sufficient criterion to enable it to establish qualifications and hours of service for employees in the safety of operation. Why, then, are the standards inadequate when applied to the congressional mandate to secure safety of equipment, efficient service, reasonable rates, and economic soundness? In this respect, the Act is not different from that vesting powers in the Commission in relation to railroads, and the latter powers have invariably been sustained. Adequate legislative standards have been found in such general terms as "public interest" and "reasonable rates", etc. In such cases the public need was a sufficient standard, and the detail involved required a flexibility inherent in administration by the Commission. Avent v. United States, 266 U.S. 127, 45 S.Ct. 34, 69 L.Ed. 202; Intermountain Rate Cases, United States v. Atchison, T. & S. F. R. Co., 234 U.S. 476, 34 S.Ct. 986, 58 L.Ed. 1408; Interstate Commerce Comm. v. Goodrich T. Co., 224 U.S. 194, 32 S.Ct. 436, 56 L.Ed. 729; St. Louis, I. M. & S. R. Co. v. Taylor, 210 U.S. 281, 28 S.Ct. 616, 52 L.Ed. 1061; New York Central Securities Corp. v. United States, 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138. These cases have turned upon the right of Congress to delegate powers to the Commission to promote sound economic conditions and efficient public service. In the Motor Carrier Act Congress has extended the power to working hours. Unquestionably, a limit might have been set, as in the Fair Labor Standards Act. But it is clear that rigidity was not practical in motor carrier transportation, and this fact is recognized by the Commission in a report in one of the ex parte proceedings to which we have referred.

Congress, therefore, vested discretion to apply limits in the situations to be developed in hearings under Sec. 225 of the Act, 49 U.S.C.A. § 325. We see no reason to doubt that reasonable requirements with respect to maximum hours of service is quite as definite as "reasonable rates". See Trustees of Village of Saratoga Springs v. Saratoga Gas, Electric Light & Power Co., 191 N.Y. 123, 83 N.E. 693, 18 L.R.A., N.S., 713, 14 Ann.Cas. 606; Interstate Commerce Commission v. Cincinnati, N. O. & T. P. Railway Co., 167 U.S. 479, 494, 17 S.Ct. 896, 42 L.Ed. 243. It is also apparent that Congress intended the Commission to avail of the experience and knowledge of other bureaus of the gov-

ernment, for authority to this end is provided in Sec. 225.[12] This, as it seems to us, is just another instance where Congress has expressed a policy, prescribed a standard, and left to the Commission the duty of applying the policy and the standard to the facts of differing situations. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624.

We, therefore, think the Commission was in error in denying jurisdiction, and that an order should be made requiring it to consider plaintiffs' petition in accordance with the views expressed in this opinion.

LETTS, Justice (dissenting).

I concede that a literal construction of the statute leads to the result announced in the court's opinion but I am not prepared to agree that Congress intended the result. The reason of the law should prevail over its letter. Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249.

The provisions of Section 202 of the Motor Carrier Act evince the clear intent of Congress to limit the jurisdiction of the Commission to regulating the motor-carrier industry as a part of the transportation system of the nation. The literal construction which the court has given the Act extends the regulation to factors which are not characteristic of transportation or inherent in the industry. It would seem to enlarge the jurisdiction of the Commission and extend it beyond the congressional grant of power. Section 202 (a) provides in part as follows: "It is hereby declared to be the policy of Congress to regulate transportation by motor carriers in such manner as to recognize and preserve the inherent advantages of, and foster sound economic conditions in, such transportation and among such carriers in the public interest."

Congress was confronted with a situation which demanded a practical solution. Casualties on the road had become countless. The legislative history seems to evidence a purpose to effect safety of opera-tion. Congress was aware that many states had enacted statutes prescribing maximum hours of service for drivers of motor vehicles operated in intrastate commerce. Of the forty-three states in which such statutes are found none has dealt with maximum hours of other employees. In such state statutes there was a lack of uniformity which operated against the public interest. By the enactment of the Motor Carrier Act Congress sought to conform such regulations. By the enactment the lack of uniformity in the detail of such statutes was overcome so far as the regulations related to interstate commerce either directly or indirectly. It has often been said by the Supreme Court that uniformity of regulation is one of the purposes of the commerce clause of the Constitution. Non-compliance with a Federal law will not be excused because it is at variance with a state statute. Congress in the enactment of the Motor Carrier Act exercised its power to insure uniformity of regulation as against the influence of conflicting and discriminating state legislation in relation to interstate commerce.

The known and grave increase in casualties and the need of conformity of regulation required serious thought and prompt Congressional action. The remedy which Congress afforded had direct relation to the evils of which it was aware and which it sought to cure. I find nothing in the legislative history which indicates that Congress in its consideration of this act gave thought to sociological problems or economic considerations beyond those naturally incident to safety of operation in interstate commerce. The history of the legislation does not reveal any legislative concern about unemployment or other related social and economic problems which would have been of prime importance if Congress had undertaken to regulate all employees including those whose duties or service have no relation to safety of operation. The inclusive language here considered was not placed in the bill by the legislative committees. Nor was it considered by the committees or discussed by any witness at any hearing. It

[12] The Commission is hereby authorized to investigate and report on the need for Federal regulation of the sizes and weight of motor vehicles and combinations of motor vehicles and of the qualifications and maximum hours of service of employees of all motor carriers and private carriers of property by motor vehicle; and in such investigation the Commission shall avail itself of the assistance of all departments or bureaus of the Government and of any organization of motor carriers having special knowledge of any such matter.

was placed in the bill by amendment offered on the floor of the Senate and accepted without debate. The amendment was not germane to the bill and if given a literal interpretation produces an unexpected and unintended result. It would extend the jurisdiction of the Commission to social problems which Congress had no thought of doing.

This view is not inconsistent with but in recognition of the Commission's power to prescribe qualifications and hours of service for all such employees whose duties relate to safety of operation. It should not be said as a matter of law that such jurisdiction extends to such classes of employees whose service has no relation to safety of operation. What classes of employees are to be so regulated is a mixed question of law and fact which will be decided in proper cases after hearings are held to determine the facts.

I am of opinion that to give the Act the broad construction which a literal meaning requires leads to an unreasonable result which is inconsistent with the intent of Congress. I conclude that this case falls within the group of cases controlled by the rule announced in the case of Ozawa v. United States, 260 U.S. 178, 43 S.Ct. 65, 67, 67 L.Ed. 199, as follows: "It is the duty of this Court to give effect to the intent of Congress. Primarily this intent is ascertained by giving the words their natural significance, but if this leads to an unreasonable result plainly at variance with the policy of the legislation as a whole, we must examine the matter further. We may then look to the reason of the enactment and inquire into its antecedent history and give it effect in accordance with its design and purpose, sacrificing, if necessary, the literal meaning in order that the purpose may not fail."

See also Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249.

To hold otherwise requires that we find in the statute necessary standards to warrant the delegation of congressional powers which a literal reading of the statute implies. I am unable to find standards in the language of the act which will protect it from assault on constitutional grounds. The absence of such standards negatives and rebuts the implication that Congress intended to extend the jurisdiction of the Commission.