474 F.2d 832
 In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.
Appeal of MORGAN GUARANTY TRUST COMPANY OF NEW YORK,
Indenture Trustee under the New York Central and
Hudson River Railroad Company Refunding
and Improvement Mortgage,
dated October 1, 1913.
 No. 71-2088.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 27, 1973.
Decided Jan. 31, 1973.
 
 S. Hazard Gillespie, John J. McAtee, Jr., Stephen H. Case, Davis, Polk & Wardwell, New York City, for appellant.
 Robert W. Blanchette, James E. Howard, Philadelphia, Pa., for appellee.
 Before McLAUGHLIN, VAN DUSEN and ADAMS, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 The basis of this appeal is an order of the district court overseeing the reorganization of the Penn Central Transportation Company (Penn Central)[1] permitting the use of certain escrowed funds for the improvement of an important freight yard.
 
 
 2
 Morgan Guaranty Trust Company (Morgan Guaranty), trustee under one of the mortgages of the Penn Central, challenges the order, alleging that by allowing the expenditures the district court improperly permitted a dissipation of Morgan Guaranty's security interest in the assets of the Penn Central.
 
 
 3
 Proper resolution of this appeal requires that the provisions of the order, No. 437, dated September 30, 1971, D.C., 332 F.Supp. 1302, be examined in some detail, and that the appropriate criterion, the four-pronged "Central of New Jersey"[2] test be explicated and applied. Before these two endeavors are commenced, however, it is useful to recall the Supreme Court's admonitions regarding the purposes and principles of Section 77 of the Bankruptcy Act, 11 U.S.C. Sec. 205, the Railroad Reorganization Statute:
 
 
 4
 first, the rights of the creditors must be guarded; second, the public's interest in the survival of the railroad as a going enterprise must be respected.[3]
 
 
 5
 The decisions of this Court, too, reflect the efforts to follow these two fundaments. See e. g., In re Penn Central Transportation Company (Appeal of First Wisconsin National Bank), 453 F.2d 520, 522 (3d Cir.), cert. denied, 408 U.S. 923, 92 S.Ct. 2493, 33 L.Ed.2d 334 (1972).
 
 I. The Yard
 
 6
 In September, 1971, the district court granted the permission sought by the Penn Central, and entered an order allowing the Penn Central to make certain improvements to the railroad's Selkirk, New York freight yard. The highlyautomated yard, located approximately 10 miles southwest of Albany, New York, is a central link for the Penn Central's freight lines, binding the railroad's services to New England, New York City and Long Island with its services to the West. Prior to the district court's order permitting the improvements, the yard could handle approximately 2700 freight cars per day. At that time, daily traffic through the yard had already exceeded the yard's capacity, and the volume was expected to increase further, with more freight being routed through the yard as the inefficient and costly New York Harbor "floating" operation was phased out. Excess traffic through the yard was increasing the cost and lowering the productivity of the yard. To increase the yard's ability to handle much of this excess traffic, and to thus reduce costs, Penn Central requested that it be allowed to make improvements to the yard. These improvements required approximately $2,074,549. to complete. Upon completion, it was estimated that annual savings of $1,076,000.[4] might be realized. Thus the yard and the efficiency the improvements would generate would be important elements in the rail system and the attempts to reinvigorate the road's freight business.
 
 II. Financing the Improvements
 
 7
 The Selkirk yard is subject to three mortgages originally entered into by one of Penn Central's predecessors, the New York Central Railroad Company. In order of their priorities, and with their appropriate corporate indenture trustees, these mortgages are:
 
 
 8
 1. The New York Central and Hudson River Railroad Company 3 1/2% Gold Bond Mortgage of June 1, 1897 (Gold Bond Mortgage), Manufacturers Hanover Trust Co., trustee;
 
 
 9
 2. The New York Central and Hudson River Railroad Company Consolidated Mortgage of June 20, 1913 (Consolidation Mortgage), Bankers Trust Company, trustee;
 
 
 10
 3. The New York Central and Hudson River Railroad Company Refunding and Improvement Mortgage of October 1, 1913 (R&I Mortgage), Morgan Guaranty Trust Company, trustee.
 
 
 11
 These three mortgages covered a significant portion of Penn Central's property. Both by past practice and by court order,[5] Penn Central was permitted to sell certain of the encumbered properties, placing the proceeds in special escrow accounts. From the funds in these accounts, Penn Central sought to finance the improvements to the yard. The order of the district court permitted Penn Central to draw from three of these accounts in a specified sequence. First, Penn Central was to draw approximately $333,214. from the Girard Bank, and $100,264. from the Manufacturers Hanover Trust Bank (hereinafter Manufacturers Hanover). These two funds were comprised of the proceeds from the postreorganization sales of properties covered by the three mortgages. The balance of the required appropriation, totaling approximately $1,756,477, was to come from a special fund at Manufacturers Hanover. This fund, too, was the result of sales of property. However, the sales which produced this fund were pre-reorganization.[6] Because the amount taken from the fund was significantly larger than the amount available for disbursing in the other funds, and because the right to this fund, representing prereorganization sales is less clear, it is this portion of the financing provisions that has drawn the most controversy.
 
 
 12
 The repayment provision of the order reflects the concern with this pre-reorganization fund. The repayment provision stipulated that during a twenty-four month period the railroad was to deposit the proceeds of sales of property subject to the mortgages in a fund that would be treated the same as the pre-reorganization fund.[7] If Penn Central's sales of property failed to generate enough to replace the withdrawal from the pre-reorganization fund, Penn Central was to provide the difference and all was to be treated as though the product of pre-reorganization sales.[8]
 
 
 13
 Examining the effects of this order at three different points in time, it can be seen that the order does make the mortgage-holders contribute to the effort to restore the Penn Central to financial solvency. To put it simply, on the day before the order the mortgage-holders had, as security for their advances, a railroad with a freight yard at Selkirk, easily disposable nonrailroad properties and a fund of money. On a day during the twenty-four month repayment period, perhaps shortly after the period began, the mortgage holders' security would consist of a railroad with an improved freight yard at Selkirk, easily disposable property and a substantially reduced fund of money. At the termination of the order the security would be comprised of a railroad with an improved freight yard, a greatly diminished amount of easily disposable property, and an amount of cash equal to the fund on hand before the order. Thus it is clear that, as a result of the order in question, the mortgage holders' security has become less marketable and even more intertwined with the railroad's operations.
 
 III. Legal Standards
 
 14
 Having described the order and its economic ramifications, and bearing in mind the principles underlying a railroad reorganization, it remains to address the legal questions arising from the district court's order.
 
 
 15
 Section 77(o) of the Bankruptcy Act, 11 U.S.C. Sec. 205(o), grants to the district court broad discretion in the application and disposition of proceeds of the sales of mortgaged property. Yet that discretion may not be completely unfettered, for in the extreme case it might result in an unconstitutional taking of the mortgage holders' property, through the dissipation of the estate. See generally Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). Thus, it becomes necessary to define the boundary beyond which the district court may not proceed.
 
 
 16
 This Court, in Central Railroad of New Jersey v. Manufacturers Hanover Trust Co., 421 F.2d 604 (3d Cir.), cert. denied, 398 U.S. 949, 90 S.Ct. 1867, 26 L.Ed.2d 289 (1970), (hereinafter Central of New Jersey), adopted a fourpronged test.[9] The test required that the district court find that certain conditions be present. If any were absent, the district court was not to permit utilization of the proceeds of the sales of mortgaged property.
 
 
 17
 The requirements of the test were stated to be:
 
 
 18
 "The rule for a reorganization under Sec. 77 . . . is that in addition to finding that the funds are presently needed and cannot be obtained elsewhere (2) the court need only conclude that reorganization is probably feasible, that the money drawn-down and expended for additions and betterments will materially contribute to the possibility of successful reorganization and to the continuation of the transportation plant, or a substantial part thereof, as a going concern, and that the interests of the bondholders are not thereby prejudiced." 421 F.2d at 606.
 
 
 19
 In Central of New Jersey, the expenditure was for the removal of the damaged span of a two-span drawbridge crucial to the system. The damaged span was likely to fall onto the operative span. The Court observed that, while removal of this threat would inure to the benefit of the bondholders, the expenditure did not increase the operational plant subject to the bondholders' lien and hence was not "an addition or betterment." As such, the expenditure could not be said to improve the bondholders' security beyond helping to assure that their security was an operating railroad, not an inoperative one. In re New York, New Haven & Hartford R. Co., No. 30226 (D.Conn., December 7, 1961), the source of the quadrifid Central of New Jersey test, did, however, deal with expenditures for additions or betterments. The endorsement of the New Haven case in Central of New Jersey indicates strongly that the fourpronged test is also to be applied here, where the expenditure is unquestionably for an addition and betterment.
 
 
 20
 The dispute in this case revolves around the district court's application of the second element of the test, regarding the finding that "reorganization is probably feasible."[10] The district court in attempting to determine whether the requisite finding could be made, was faced with a difficult predicament. At the time of their petition for the expenditures, the trustees of the railroad had not filed a reorganization plan, nor was one imminent. Moreover, it was clear that any plan for reorganization would require an extended period of time to complete, and assessment of its success at any given moment might be difficult. To resolve the dilemma, the district court interpreted the "probably feasible" requirement to mean in that particular context:
 
 
 21
 "Where, as in the present instance, the issue arises at a relatively early stage of the reorganization proceeding, when it is too early to make confident predictions one way or the other, I believe it should be sufficient to find merely that there is no demonstrated likelihood of failure."
 
 
 22
 At the time the order in question was entered, the approach fashioned by the district court appeared to be the only one possible. To insist on more would be to require a full examination of the trustees' intentions before the trustees themselves had crystalized their plans, or, to defer all expenditures of this category of funds, thus making the probability of successful reorganization even more dubious. Under these circumstances, we do not disagree with the result.
 
 
 23
 Nevertheless, certain questions remain. Arguably, the district court's reformulation of the "probably feasible" test could be read to suggest that the burden of proof has been shifted. We agree with Morgan Guaranty that were such a shift to be permitted, it might well defeat that portion of the test, for the information needed to satisfy the requirement is generally within the control of the trustees of the railroad. We do not understand, however, that the district court's opinion produced such a shift. Rather, it seems to have called upon the trustees to show that at this stage, reorganization was not improbable. In the early periods of a complex and protracted reorganization, such a standard appears appropriate.
 
 
 24
 We are also advised of the more recent developments in the railroad's struggle for fiscal survival. These factors, of course, must be considered by the district court in any contemporary application of the Central of New Jersey test. Our task as an appellate court is not, however, to apply the test in the first instance. Rather, we must review the district court's application of the test. At the time the district court was called upon to apply the Central of New Jersey rule, it did so on the basis of the evidence then available. Later evidence does not affect the propriety or inaccuracy of the district court's findings at the time it was required to make them.
 
 
 25
 The order of the district court did not require the Penn Central, while replacing the $1,756,477., to pay interest on that sum. As discussed earlier, the fund that produced the $1,756,477. was created by pre-reorganization sales, and the right to it, as between Penn Central and the mortgage holders, is contested. The fund was in an interest-bearing account at the Manufacturers Hanover. Though Penn Central is required to replace the fund, the sum restored will not equal the sum that would be present had the money remained in interest-bearing accounts. Therefore, we remand the matter to the district court with instructions to modify its order so as to include a requirement that the trustees of the railroad pay interest, at the market rate, on this fund for the period that it was not drawing interest in the account at the Manufacturers Hanover.
 
 
 26
 Appeals involving the reorganization of any railroad, and especially a railroad as large and as crucial to the national economy as the Penn Central, require a court to weigh carefully the competing claims of the railroad's creditors and the nation's concern with its transportation system. In this case, we believe that an appropriate balance has been struck, one that will respect the interests of the creditors yet help preserve the Penn Central as a viable railroad.
 
 
 27
 An appropriate order will be entered affirming the district court with provision for the district court, on remand, to provide for interest in accordance with this opinion.
 
 
 
 [1]
 The trustees of the property of the Penn Central Transportation Company, George P. Baker, Richard C. Bond, Jervis Langdon, Jr. and Willard Wirtz, are the named appellees in this case and the petitioners in the district court. They will be referred to as the Penn Central in this opinion
 
 
 [2]
 Central R. Co. of New Jersey v. Manufacturers Hanover Trust Co., 421 F.2d 604 (3d Cir.), cert. denied, 398 U.S. 949, 90 S.Ct. 1867, 26 L.Ed.2d 289 (1970)
 
 
 [3]
 "After 35 years of Sec. 77, as amended, it is unnecessary to recanvass the two basic objectives of the statute-the conservation of the debtor's assets for the benefit of creditors and the preservation of an ongoing railroad in the public interest. See generally 5 Collier, supra, p 77.02, at 469-470. Central to the statutory objective that the reorganized company should, if at all possible, emerge as a 'living, not a dying . . . enterprise,' Van Schaick v. McCarthy, [10 Cir.] 116 F.2d 987, 993, is the understanding that 'a railroad [is] not like an ordinary insolvent estate.' Palmer v. Massachusetts, 308 U.S., at 86 [60 S.Ct. 34, 84 L.Ed. 93] (Footnote omitted.)" New Haven Inclusion Cases, 399 U.S. 392, 431, 90 S.Ct. 2054, 2078, 26 L.Ed.2d 691 (1970)
 "While the rights of the bondholders are entitled to respect, they do not command Procrustean measures. They certainly do not dictate that rail operations vital to the Nation be jettisoned despite the availability of a feasible alternative. The public interest is not merely a pawn to be sacrificed for the strategic purposes or protection of a class of security holders whose interests may or may not be served by the destructive move." Penn Central Merger Cases, 389 U.S. 486, 510-511, 88 S.Ct. 602, 614, 19 L.Ed.2d 723 (1968) (portion of opinion dealing with New Haven Railroad which was at that time undergoing reorganization).
 
 
 [4]
 The trustees estimated that $726,000 would be saved by eliminating already existing delays, and a $350,000 saving would be produced by further utilization of the yard
 
 
 [5]
 See Orders 78, 192 & 271 in this Reorganization
 
 
 [6]
 Since 1961, by agreement between the predecessor railroad and Manufacturers Hanover, certain properties under the mortgages were sold. The proceeds were received by Manufacturers Hanover, which then financed the purchase of rolling stock under conditional sales agreements. The Railroad's payments on the rolling stock then went into the escrow fund
 
 
 [7]
 On November 27, 1972, the date of oral argument before this Court, counsel stated that as of that date Penn Central had not been in default in its repayment obligations under this order
 
 
 [8]
 Manufacturers Hanover and Bankers Trust, trustees under the first and second mortgages, did not oppose the railroad's petition. Rather, preferring a compromise to litigation, they joined with the railroad in a draft order which substantially became the order of the district court. Morgan Guaranty, however, did oppose the order and their appeal is that with which we must presently deal
 
 
 [9]
 The test was first enunciated by Judge Anderson in In re New York, New Haven & Hartford R. Co., No. 30226 (D.Conn., December 7, 1961) (unreported)
 
 
 [10]
 Morgan Guaranty also argues that there are inadequate bases for the findings that the other three requirements of the Central of New Jersey have been met. The district court's determination of these questions, however, is sound and will not be further reviewed