484 F.2d 323
 In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.
Appeal of MORGAN GUARANTY TRUST COMPANY OF NEW YORK, as
trustee under the New York and Harlem Railroad
Company Gold Bond and Second Mortgages,
in Nos. 72-2116, 72-2117.
Appeal of MORGAN GUARANTY TRUST COMPANY OF NEW YORK, as
Indenture Trustee under the New York Central and Hudson
River Railroad Company Refunding and Improvement Mortgage
dated October 1, 1913, in Nos. 72-2118, 72-2119.
Appeal of The FIDELITY BANK, as a stockholder in and on
behalf of the New York and Harlem Railroad
Company, in Nos. 72-2120, 72-2121, 72-2123.
Appeal of The FIDELITY BANK, on behalf of: (A) itself and
all other stockholders of the New York and Harlem Railroad
Company other than Penn Central Transportation Company; and
(B) the New York and Harlem Railroad Company, in No. 72-2122.
Appeal of MANUFACTURERS HANOVER TRUST COMPANY, as Indenture
Trustee under the New York Central and Hudson River Railroad
Company Three and One-Half Percent Gold Bond Mortgage, dated
June 1, 1897; Bankers Trust Company, as Indenture Trustee
under the New York Central and Hudson River Railroad Company
Consolidation Mortgage dated June 20, 1913; and Morgan
Guaranty Trust Company of New York, as Indenture Trustee
under the New York Central and Hudson River Railroad Company
Lake Shore Collateral Indenture dated February 4, 1898, and
the New York Central and Hudson River Railroad Company
Michigan Central Collateral Indenture, dated April 13, 1898,
in No. 72-2124.
Appeal of Richard Joyce SMITH, Trustee of the property of
the New York, New Haven and Hartford Railroad
Company, Debtor, in No. 72-2125.
Appeal of PENN CENTRAL COMPANY, in No. 72-2126.
 Nos. 72-2116 to 72-2126.
 United States Court of Appeals,
Third Circuit.
 Argued April 12 and April 13, 1973.
Decided June 14, 1973.
As Amended July 20, 1973.
Rehearing Denied July 23, 1973.
Certiorari Denied Dec. 3, 1973.
See 94 S.Ct. 598.
 
 Douglas M. Galin, Davis, Polk & Wardwell, New York City, for appellant in Nos. 72-2116, 72-2117.
 Frederic L. Ballard, Alan S. Fellheimer, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for appellant in Nos. 72-2118, 72-2119.
 John H. Lewis, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for appellant in Nos. 72-2120, 72-2123.
 Edward Roberts, III, Kelley, Drye, Warren, Clark, Carr & Ellis, Donald M. Wilkinson, Jr., White & Case, New York City, for appellants in No. 72-2124.
 Joseph Auerbach, Sullivan & Worcester, Boston, Mass., James W. Moore, New Haven, Conn., for appellant in No. 72-2125.
 David Berger, Philadelphia, Pa., for appellant in No. 72-2126.
 Marvin Comisky, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., Charles A. Horsky, Covington & Burling, Washington, D. C., for appellees, Trustees in all cases.
 Before ADAMS, GIBBONS and WEIS, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 An order of the district court permitting the Trustees of the Penn Central Transportation Company (Trustees) to sell four New York office buildings, located in the area adjacent to Grand Central Terminal, is the basis of this appeal. The district court's decree[1] was the most recent step in a protracted attempt by the Trustees to dispose of the highly valuable holdings of The Penn Central Transportation Company (Penn Central) in office buildings situated along both sides of Park Avenue from Forty-Second Street beyond Fiftieth Street in midtown Manhattan.
 
 
 2
 On June 21, 1971, almost one year to the day that the Penn Central filed for reorganization, the Trustees extended to the public invitations to bid on twenty-three separate parcels of Manhattan real estate. The bids received on the majority of the properties fell sufficiently below the Trustees' expectations that they did not pursue the opportunity to sell those properties. On six of the properties tendered, however, the Trustees, satisfied with the offers petitioned the district court for permission to sell.[2] The district court, in an exhaustive and thorough opinion, granted permission as to four of the properties, for a total of approximately $14 million. The court refused authorization to sell two of the parcels, for which about $45 million had been bid.[3]
 
 
 3
 The action of the Trustees and the limited approval of the district court has prompted appeals by the Morgan Guaranty Bank, the Trustee of the property of the New Haven Railroad, the Fidelity Bank, the Penn Central Company, Manufacturers Hanover Trust Company and the Bankers Trust Company. The appellants, representing different creditor, bondholder and shareholder interests, raise two separate legal theories. By order of this Court, the appeals were consolidated and oral argument was heard one day each for the two different issues.
 
 
 4
 One contention, advanced by all appellants, challenged the district court's authority, jurisdiction and wisdom in approving the sales. Resolution of this issue requires that this Court examine section 77(o)[4] of the Bankruptcy Act, and analyze its place in the general program for railroad reorganization established by the Act.[5]
 
 
 5
 The second branch of the appellants' argument focuses on questions arising from the nature of the interest Penn Central holds in a number of the properties it is seeking to sell. In several of the properties, Penn Central's interest was not in fee but was a leasehold estate,[6] or a tenancy in common,[7] with the New York and Harlem Railroad Company (Harlem) in both cases holding the remaining interest. The appellants contend that, as to these properties, the interest of Penn Central may be transferred only if certain conditions are present and satisfied.
 
 
 6
 Before beginning an examination of the history of the railroads involved, their intertwined financial arrangements, and the proper scope of proceedings under section 77(o), all of which are essential to understanding and resolving this dispute, it should be noted that one important problem is not present in this appeal. The proceeds from any sale of the Park Avenue properties are not to be available to the Trustees to be used for railroad "additions and betterments" or to augment railroad working capital. Rather, the proceeds are to be invested in government securities.[8] Thus, the appellants do not contend that this sale constitutes a taking of their property without compensation, as they might if the proceeds from the sale of these properties were to be used to attempt to improve or keep alive an arguably dying railroad.[9]
 
 
 7
 I. Brief History of the Three Railroads: The Harlem, New York Central and New Haven
 
 
 8
 The buildings the Trustees sought permission to sell are built over railroad tracks that link Manhattan with upstate New York and New England, including the suburban counties of Westchester, New York and Fairfield, Connecticut. Placing these tracks underground in the first decade of the twentieth century provided the railroads with an extensive area of midtown Manhattan suitable for development.[10] Defining the property rights held by the various parties in the tracks and the extensive group of buildings raises a complicated problem.
 
 
 9
 a. The Harlem
 
 
 10
 In 1831, the New York and Harlem Railroad (Harlem) was incorporated by the New York legislature. By 1872, its tracks extended from Forty-Second Street, in Manhattan, to Chatham Four-Corners, 130 miles up the Hudson River. During the Civil War, Commodore Vanderbilt decided to enter the railroad business, which he saw as both the transportation of the future and an arena for the manipulation of stock.[11] He purchased sufficient shares to control the Harlem, pushing up the price per share as he bought. Through generous contributions to the powers that controlled municipal government in New York, Vanderbilt secured for the Harlem a franchise to run streetcars from Forty-Second Street to the Battery. The New York state legislators, incensed at what they conceived to be a usurpation of their power to dispense lucrative franchises, and apparently desirous to avail themselves of an opportunity to make large profits in stocks, indicated their intention to cancel the Harlem's streetcar franchise.
 
 
 11
 While deliberating legislatively, the assemblymen began selling "short" shares (shares they did not own) of the Harlem. Vanderbilt soon became aware of this scheme and, to defeat it, proceeded to purchase all the outstanding shares of the Harlem. When the date arrived when the legislators had to deliver the shares they had sold "short," they were forced to acquire the shares from Vanderbilt who showed them but slight mercy in establishing the price. Thus, by the mid-1860's, Commodore Vanderbilt had firm control of a railroad line running from mid-Manhattan to a point about one-third the distance to Albany.
 
 
 12
 b. The New Haven
 
 
 13
 The New York and New Haven Railroad Company (New Haven) was chartered by the State of Connecticut in 1844, and built rail lines extending from New Haven to the New York State border.[12] Unable to obtain the consent of the New York legislature to extend its railroad into New York, the New Haven, in 1846, entered into an agreement with the Harlem that provided that their respective lines would be built so as to meet near the New York-Connecticut border. The New Haven was granted the right to operate its trains over the tracks of the Harlem from this junction as far into New York as the Harlem extended. This 1846 agreement was, in effect, ratified by the New York legislature which, in 1848, amended the Harlem's charter to permit this action. The legal effect of the 1846 agreement and the ensuing legislation has been held to be that the New Haven possessed a perpetual easement in the Harlem road, akin to a franchise.[13] Thus, the New Haven had an important interest in the tracks running into Manhattan.
 
 
 14
 c. New York Central
 
 
 15
 Another railroad taken over by Vanderbilt was the Hudson River Railroad Company. Its lines paralleled the Harlem's up the Hudson River and then continued to Albany. The New York Central Railroad, a combination of ten small railroads, consolidated in 1853, extended from Albany to Buffalo. By the time of Vanderbilt's entry onto the railroad scene, the New York Central had become very profitable, lacking only a link to New York City. Not surprisingly, it looked covetously at Vanderbilt's Hudson River Railroad and Vanderbilt returned the compliment. In the contest over who was to acquire what, Vanderbilt displayed his usual dexterity. Claiming to rely on a long-forgotten law, Vanderbilt, whose trains had crossed the Hudson River at Albany to meet the New York Central, ordered his trains halted on the east bank of the Hudson, in the middle of the winter. Forcing passengers to cross the river on an icy and treacherous railroad bridge resulted in a decline in business for the New York Central and a consequent drop in the price of its stock to the point that Vanderbilt acquired the New York Central quite easily.[14] Hence, by the end of the 1860's, three railroads, the newly combined New York Central and Hudson River Railroad Company (Central), the Harlem and the New Haven were running into Manhattan from the North and Northeast. And each terminated at Forty-Second Street.[15]
 
 
 16
 On November 1, 1872, the three railroads entered into an agreement to erect a new station at Forty-Second Street to be known as the Grand Central Depot. The station was to be built by the Harlem, which would lease it to the New Haven and Central for the joint use of the three companies.[16]
 
 
 17
 On April 1, 1873, the Central and the Harlem entered into a 401 year lease (the Harlem lease).[17] As the district court explained, long-term leases were a commonly utilized method for acquisitions in the railroad industry, providing the advantages of combined operations while avoiding legal and practical difficulties inherent in a formal merger.[18] In this case, the legal difficulties may have appeared especially imposing since the franchise of the Central was for only fifty years while the Harlem's was for 999 years.[19] The lease between the two railroads reflected the domination of each by the Vanderbilts: it was signed by W. H. Vanderbilt for the Harlem and C. Vanderbilt for the Central.
 
 
 18
 The Harlem lease provided that the Central was to fulfill all the obligations of the Harlem regarding the erection of the Grand Central Depot at Forty-Second Street.[20] The New Haven's rights under the 1872 agreement, providing that its easement to use the tracks and terminal for the life of its charter that was perpetual, were unaffected.[21] After the Harlem Lease was signed and the Grand Central Depot completed, there were three parties with interests in the land, station and tracks running into Manhattan from the north: the New Haven with a perpetual easement, the Harlem with the fee interest in some of the land, and the Central with a fee interest in a portion and a leasehold in the remainder.21a
 
 
 19
 In 1903 and 1904 the New York legislature passed statutes requiring that the tracks be placed underground for the fifteen blocks north of the then-existing Grand Central Depot. To obey the legislature's mandate, and realizing the tremendous opportunity for development available if buildings were constructed in the air-space over the sunken tracks, the Central and the New Haven entered into a contract, in 1907, for the construction of a new Grand Central Terminal,[22] and the operation of the approaches to this terminal. By this agreement, the New Haven's right to the use of tracks and the railroad terminal was reaffirmed. "'Railroad terminal' was defined to 'mean and include the land, and interests in land, and all improvements thereon . . ., and all rights in any ways on which said land may abut'. . . ."[23]
 
 
 20
 With all three railroads holding their respective interests in the underlying land, the property was developed into hotels and office buildings.
 
 
 21
 By the mid-1960's, the New Haven had entered reorganization, with the prospects for fiscal stability slim unless it could be absorbed into a larger carrier. During the same period, the Central and the Pennsylvania Railroad Company were negotiating and seeking approval of a merger. The ICC and the courts[24] conditioned their approval of the Pennsylvania-Central merger upon an agreement by these two large carriers to takeover the operation of the New Haven and pay a sum of money to the New Haven bondholders. Of that sum, $28 million was attributed to the value of the New Haven's interest in Grand Central Terminal and the Park Avenue Properties.
 
 
 22
 With the entry into reorganization of the now-merged Penn Central, questions arose concerning the position of the New Haven bondholders' interest in the Park Avenue Properties. The district court has held that the properties are impressed with a trust for the benefit of the New Haven bondholders, although the nature and priority of the trust has not been definitively determined. These buildings, developed by the three railroads and referred to as the Park Avenue Properties, are located in what has been referred to as "the ideal location for New York and possibly anywhere in the world for office building use."[25]
 
 
 23
 We are called upon to review the district court's order granting the Trustees permission to sell four of these properties.
 
 II. Financial Background
 
 24
 As stated above, the Harlem, which owns the fee interest in a portion of the Park Avenue Properties whose sale has been proposed, entered into a lease with Central in 1873. Pursuant to that lease, the Central, as lessee, was obligated to make annual payments to the holders of Harlem stock, and to assume certain tax and mortgage obligations of the Harlem. At the same time, the Central was empowered to sell properties subject to the lease that were not necessary for railroad operations, on the condition that Central account for the proceeds at the conclusion of the 401 year term of the lease.[26] The lease also provided that the Harlem could not create any additional bonded indebtedness without the consent of the Central.[27] However, the Harlem. at the time of the lease, had outstanding bonded indebtedness. The lease provided that the Harlem could issue new bonds to refund the outstanding indebtedness and such new bonds were to be "secured by a suitable mortgage upon the railroad property and franchises hereby demised."[28]
 
 
 25
 In June, 1897, the Harlem issued new bonds in the amount of $12 million, maturing in the year 2000, secured by a suitable mortgage (Harlem first, or gold, mortgage).[29] The security pledged under the mortgage was "the Harlem's interests in the railroad property as well as Harlem's rights under the original 1873 lease to the Central."[30] There are detailed provisions relating to the requirements that must be met prior to the release of any property subject to the lien.[31] To resolve litigation that subsequently arose between the Central and the Harlem, a settlement between them was reached that required the Central to pay the principal and interest on the bonds, as each became due.[32]
 
 
 26
 In 1943, the Harlem, once more to compromise litigation with the Central, issued a second mortgage, in the amount of $7,800,000 and due 2043 (Harlem Second Mortgage).[33] This mortgage, too, had extensive provisions regarding the sale of property subject to the mortgage. Again, the Central was obligated to pay interest and principal for this mortgage.[34]
 
 
 27
 The first and second Harlem mortgages contained a common provision upon which a portion of this present litigation turns. Each instrument stated that the property pledged was mortgaged subject to the rights of the Central in respect to such property arising under the 1873 Harlem lease.
 
 
 28
 The financial background of the Central as it pertains to the proposed sales, is perhaps less complicated than that of the Harlem. Both the leasehold interest and the fee interest of the Central in the Park Avenue Properties are subject to three mortgages:
 
 
 29
 1. The New York Central and Hudson River Railroad Company 3 1/2% Gold Bond Mortgage of June 1, 1897 (Gold Bond Mortgage), Manufacturers Hanover Trust Co., Trustee;
 
 
 30
 2. The New York Central and Hudson River Railroad Company Consolidated Mortgage of June 20, 1913 (Consolidation Mortgage), Bankers Trust Company, Trustee;
 
 
 31
 3. The New York Central and Hudson River Railroad Company Refunding and Improvement Mortgage of October 1, 1913 (R&I Mortgage), Morgan Guaranty Trust Company, Trustee.[35]
 
 
 32
 There are 200,000 shares of common and preferred in the Harlem that are outstanding. Of these, the Penn Central, successor in interest to the New York Central, owns 190,178 or approximately 95%. Under the terms of the R & I mortgage, virtually all of the Central's shares in the Harlem are pledged with the R & I mortgage trustee, Morgan Guaranty Trust Company.
 
 
 33
 With this plethora of trustees and intertwined corporate obligations created by the financial underpinnings, the advent of Central's successor, Penn Central, into reorganization, and the trustees' request to sell property covered by the various agreements, has spawned a host of problems, many of them implicated in this litigation. Resolution of these problems must be deferred until after this Court first has considered the district court's jurisdiction and authority to order these sales under section 77 (o) of the Railroad Reorganization Act.
 
 
 34
 III. Section 77(o) of the Railroad Reorganization Act
 
 
 35
 There are three basic statutory provisions governing bankruptcy and reorganization: (1) Chapter X, 11 U.S.C. Secs. 501-676, controlling corporate reorganizations and covering plans to restructure both secured and unsecured debt, (2) Chapter XI, 11 U.S.C. Secs. 701-799, dictating the program for formulating arrangements for the benefit of unsecured creditors, and (3) section 77, 11 U.S.C. Sec. 205, determining the procedures to be followed by the railroads. The provisions of section 77, though in many respects different from those of Chapters X and XI, are controlling in this case.
 
 
 36
 This Court, now not infrequently faced with appeals arising from railroad reorganization litigation, has often stated the principles undergirding section 77:[36]
 
 
 37
 "[F]irst, the rights of the creditors must be guarded; second, the public's interest in the survival of the railroad as a going enterprise must be respected."[37]
 
 
 38
 The method prescribed by Congress in section 77, to achieve the balance desired, is the formulation and adoption of a reorganization plan. Section 77 (b)[38] sets forth what must be, and what may be included, in the plan. After promulgation of the reorganization plan, it must be submitted to the Interstate Commerce Commission pursuant to section 77(d).[39] Section 77(d) requires that the ICC examine the proposal and approve a plan "that will in its opinion meet with the requirements of subsections (b) and (e) of this section, and will be compatible with the public interest." Thus, it is clear that the ICC is charged, in the first instance, with weighing the factors so as to reach the congressionally mandated balance.
 
 
 39
 Following approval of the reorganization plan by the ICC, it is certified to the district court. In conformity with section 77(e),[40] the district court is to hold hearings and if satisfied that the plan certified by the ICC complies with the statute and serves the statute's purpose, submit the plan to the creditors for approval.
 
 
 40
 The Supreme Court has recently elaborated on this basic scheme of the reorganization statute, the statute's insistence on the formulation and approval of a reorganization plan, and its two-step examination and approval of the plan, with both the ICC and the district court participating actively in the formulation of the plan:
 
 
 41
 "In structuring the cooperative endeavor of agency and court, Congress 'placed in the hands of the Commission the primary responsibility for the development of a suitable plan' for the debtor railroad. . . . As is clear from the legislative history and Sec. 77 itself, the deference to the Commission as initiator of the plan of reorganization stems from the 'recognition by everyone of the advantages of utilizing the facilities of the Commission for investigation into the many-sided problems of transportation service, finance and public interest involved in even minor railroad reorganizations and utilizing the Commission's experience in these fields for the appraisals of values and the development of a plan of reorganization, fair to the public, creditors and stockholders.'
 
 
 42
 "But the respect given the Commission as draftsman of the plan of reorganization entails no abdication of judicial responsibility for the workings of the administrative agency . . .******
 
 
 43
 * * *
 
 
 44
 "In sum, Congress has confided to the reorganization court the 'power to review the plan to determine whether the Commission has followed the statutory mandates . . . and whether the Commission had material evidence to support its conclusions.' . . . In the reorganization court reposes ultimate responsibility for determining that the plan presented to it by the Commission satisfies the 'fair and equitable' requirement of Sec. 77. . . . And at the heart of that determination as we have already noted, is the valuation of the debtor's property. Here, as elsewhere in the reorganization proceedings, the court must look to the conclusion recommended by the Commission. . . ."[41]
 
 Section 77(o) states, in pertinent part:
 
 45
 "(o) The trustee or trustees, from time to time, shall determine what lines or portions of lines of railroad and what other property of the debtor, if any, should be abandoned or sold during the pendency of the proceedings in the interest of the debtor's estate and of ultimate reorganization but without unduly or adversely affecting the public interest, and shall present to the judge petitions, in which other parties in interest may join, for authority to abandon or to sell any such property; . . ."[42]
 
 
 46
 Unlike section 77(d) and (e), section 77(o) has not been the subject of extensive judicial discussion.[43] Section 77 (o), as the Trustees strongly urge, does, by its explicit language, permit the trustees of a railroad in reorganization to seek court approval of the sale both of rail lines and of properties outside the reorganization plan. Yet this provision has not, in the past, been considered to provide an important alternative to the procedure prescribed by section 77(b), (d) and (e).[44] A leading text discussing the legislative history of section 77 states that the general legislative formulation was simplified and clarified by amendments made in 1935. While subsection (o) was added to section 77 as one of those amendments,[45] it was not mentioned by the text as being among the important changes made at that time.[46]
 
 
 47
 The legislative history of the subsection does not address the question of how extensive may be a sale under 77 (o). Also, it significantly gives no indication that large-scale dispositions of property may permissibly be made pursuant to 77(o), so as to by-pass the procedures of subsections 77(d) and 77(e).
 
 
 48
 Given these two indicia of the role contemplated for section 77(o), and considering the admonition of Justice Frankfurter that: "If ever a long course of legislation is to be treated as an organic whole, whose parts are not disjecta membra, this is true of Sec. 77,"[47] it remains to be determined whether the requested sales may be authorized under section 77(o).
 
 
 49
 Thus, as is often the task of the judiciary, to determine this dispute, we are called upon to harmonize two seemingly inconsistent legislative pronouncements. Here, the Court must reconcile the power to sell property outside of a reorganization plan, pursuant to Sec. 77 (o), with the primary importance assigned to the reorganization plan, as set forth in Sec. 77(d) and (e). This synchronization, in our judgment, can be achieved if section 77(o) is given a scope sufficiently flexible to encompass many sales of property but not sales that represent any part of, or step in, a reorganization plan. The question before the Court thus becomes whether the sales are apart from a reorganization plan, or are the sales, in reality, part of a reorganization plan.[48] Resolution of this question requires this Court to engage in a task of line drawing. However, most complicated legal questions involve the drawing of lines. Indeed, this is a task for which the judiciary has been said to be particularly well-suited.
 
 
 50
 The requested sale included six parcels, valued at approximately $60 million, roughly ten per cent of the total value of the Park Avenue Properties. The amount involved alone indicates that the proposal is not a de minimis sale. Further, the six parcels proposed for sale are not a contiguous or discrete portion of the Park Avenue Properties. Rather, they are dispersed throughout the Park Avenue area and the only reason apparent for selection of these is that the bids for them were closer to expectations than were the bids on the others. These factors indicate that the proposed sale cannot be considered an isolated transaction, but must be viewed as a portion of a plan for reorganization.
 
 
 51
 Moreover, this Court is not unaware of the memorandum and order of the district court dated March 6, 1973.[49] That order required that the Trustees file with the district court a plan for reorganization by July 2, 1973. If the Trustees cannot, by that date, supply a feasible plan for reorganization, they are instructed to file proposals for the liquidation of the entire enterprise, such disposition to begin by October 1, 1973.
 
 
 52
 In view of the imminence of the deadline date for submission of the plan, and taking judicial notice of the statements of persons participating in the reorganization to the effect that the railroad cannot continue without massive governmental assistance, this Court concludes that the sale of the Park Avenue Properties may not properly be authorized under section 77(o) of the Bankruptcy Act. In the context of this case, if such sales are to take place, they must be made as part of a reorganization plan, approved pursuant to the provisions of sections 77(d) and 77(e).[50]
 
 IV. Harlem Lease Matters
 A. Power of Sale Under the Lease
 
 53
 The Fidelity Bank, on behalf of the minority (5%) shareholders of the Harlem, and the Morgan Guaranty Trust Company, in its capacity as Trustee under the first and second Harlem mortgages, have questioned the power to sell the Park Avenue Properties that the Penn Central claims as successor under the Harlem lease. Fidelity asserts, basically, that the Penn Central can convey only its leasehold interest in the Park Avenue Properties in which the Harlem possesses an interest and that the fee can be conveyed only if the Harlem, retaining its reversionary interest, joins the conveyance. The Morgan Guaranty claims that it possesses a lien on the property pursuant to the Harlem mortgages and that no conveyance may be carried out without Morgan Guaranty's furnishing a release from such lien.
 
 
 54
 The district court discussed these questions with perception and clarity. However, in view of this Court's decision in section III of this opinion, holding that the sales may not be made under section 77(o) but only as part of a reorganization plan, this Court believes that the questions raised by these two challenges are no longer ripe for adjudication. When a reorganization plan is submitted to the district court, and if sales of these properties are included in this plan, the time will then be appropriate to resolve these issues.
 
 B. The Affirmance of the Lease
 
 55
 The Fidelity Bank challenges the district court's approval of the Trustees' affirmance of the Harlem lease, asserting that the affirmance was improper because it was not made within a "reasonable time."[51] The district court held that the affirmance was timely made. It based its holding on several factors, two of which this Court finds persuasive. We agree with the district court that in view of the complexity of the questions confronting the Trustees the affirmance was timely. Further, we agree that because the Trustees acted within the extensions granted them by the district court, without protest from Fidelity, their affirmance was not improper.
 
 
 56
 Accordingly, as to the affirmance of the Harlem lease, we sustain the district court.[52]C. Obligations of the Penn Central Arising Under the Harlem Lease
 
 
 57
 The Morgan Guaranty Trust Company, as Trustee under the first and second Harlem mortgages, claims that it is entitled to full payment by Penn Central of the outstanding principal of these mortgages, as a condition to affirmance of the lease. Morgan Guaranty states that the mortgages provide for payment of the principal upon default of any term of the lease. It further asserts that the mortgages obligate the Penn Central to pay real estate taxes on the property secured, and that these taxes have not been paid. Therefore, it contends, there has been a default on the mortgages and a full payment of principal is now due.[53]
 
 
 58
 To accept this argument by Morgan Guaranty would require this Court to place the Harlem bondholders above the bondholders of the Penn Central. As we have sought to explain, the Harlem, at the time the mortgages were executed, was under the domination of the Central, Penn Central's predecessor. The Harlem bondholders looked to the Central, then, in considering the security of their investment. To look away, now, from the Central and to focus instead on the formal corporate separation would be unreaalistic and improper. Therefore, the claim of the Morgan Guaranty for acceleration is rejected.
 
 
 59
 Nonetheless, the Court is not prepared to disregard completely the differences between the Harlem and the Penn Central. Under the lease, the Penn Central was obligated to pay all taxes due on the Harlem property. The failure of the Trustees to pay these taxes has resulted in the imposition of a lien on the Harlem property prior to the lien of the Harlem mortgages, thus to some extent endangering the mortgagees' security. To attempt to alleviate this inequity, we direct that the taxes owing on the Harlem property be accorded a priority above the normal priority accorded taxes, making these taxes the first taxes to be paid by the Trustees.
 
 
 60
 The Morgan Guaranty, in its capacity as Trustee under the R & I mortgage of the New York Central, contends that it is entitled to rental payments or dividends on the stock of Harlem. Under the R & I mortgage, the shares of the Harlem owned by Penn Central are pledged as security for the bonds. Morgan Guaranty claims that since the R & I bonds are in default, it has foreclosed on the collateral and now is in possession of the Harlem shares. As stated earlier, Penn Central holds title to about 95% of the Harlem shares, the remaining 5% being publicly held. The $5 dividend, or rental payment, due on the 5% of the shares not held by the Penn Central has been paid throughout the reorganization, although no payment has been made on the 95%. Morgan Guaranty asserts that because these shares have passed from the Penn Central to the mortgage trustee as a result of the default, it is entitled either to receive the dividends accrued and those that come due or to have these claims ranked as an administrative claim.
 
 
 61
 The district court, relying on this Court's opinion in In re Philadelphia & Reading Coal & Iron Co.,[54] held that the income produced by the pledged shares was available to the Trustees of the Penn Central and need not be paid to the pledgee. Having thus denied the claim for immediate payment, the district court deferred a determination of the status to be accorded Morgan Guaranty's claim until the formulation of the reorganization plan. We affirm these holdings of the district court.
 
 V. The New Haven Claims
 
 62
 The Trustee of the New Haven Railroad asks this Court to impose upon the proceeds of the proposed sale a constructive trust.[55] The district court having held that the claims of the New Haven constitute a tentative, though indeterminate lien on the property,[56] and this Court having, by this opinion, refused to permit the sale of the Park Avenue Properties under section 77(o), further discussion of the New Haven's claim is at this time inappropriate.
 
 VI. Conclusion
 
 63
 Resolution of this case has required the Court to attempt to interpret a statute of Congress. Confronted with such a task, it is the responsibility of the Court to restrict its inquiry to ascertaining what, in fact, Congress directed, not what Congress might have said, what we think Congress might more wisely have said, or what Congress might say were it speaking today.
 
 
 64
 From this admonition, the Court has had to grapple with the problem presented here wherein a section of a statute states a proposition that, if read in vacuo, would appear incompatible with the congressional directive manifested by the entire statute. However, this problem is not unique. Justice Cardozo, when faced with a similar task, provided a clear and compelling answer: "[T]he meaning of a statute is to be looked for, not in any single section, but in all the parts together and in their relation to the end in view."[57] Accordingly, we have endeavored to follow this exhortation so that the purposes of Congress may be faithfully carried out. In so doing, however, the inadequacies of section 77 have become apparent. That section, enacted during the depression, does not seem to be responsive to the urgent problems confronting the railroads in the northeast today. The depression-spawned railroad bankruptcies were the product primarily of over-capitalization, and section 77 contemplates a program of restructuring capital. Today, however, the ingredients of an insolvency are far more complex; the railroads themselves have become corporate conglomerates, and the transportation alternatives are now more numerous. These factors require that a reorganization be not merely a restructuring of capital, but a complete assessment of the cost and value of the railroad and the service it can render to the region or nation. Such a reappraisal cannot be done properly under section 77, and may be beyond the faculties of a court. An assignment like this may more adequately be discharged by an agency such as the ICC, an agency with investigative facilities and an expertise developed over a number of years.
 
 
 65
 The role of the Court is not, however, to attempt to create a new law by interpolating into the existing statute concepts not placed there by Congress. Our charge is to interpret and apply the statute, as it is enacted, so that the purpose of Congress, as manifested by the statute, is carried out. And it is to this end that we have labored.
 
 
 66
 Although change should not be unduly retarded, changes such as contemplated here cannot be brought about by judicial injection, as tantalizing a prospect as that course might be. Instead, the role of the judiciary in our society must be a carefully circumscribed one.
 
 
 67
 As to order No. 974, paragraph 1 will be reversed and paragraph 2 will be affirmed. As to order No. 975, it will be affirmed as modified by this opinion. Orders numbered 976 and 977 will be affirmed, and as to order No. 980, the cause will be remanded for further proceedings in accordance with this opinion. With respect to the cost of printing the appendix, the appellees shall bear one-half of same, and the appellants shall divide the remaining one-half equally amongst themselves and each shall bear the cost of its share. Each party shall bear the cost of printing its own brief, as well as any other properly taxable costs.
 
 
 68
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLESUR PETITION FOR REHEARING
 
 
 69
 Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN and WEIS, Circuit Judges.
 
 
 70
 The petition for rehearing filed by Appellees-Trustees in the above-entitled cases having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.
 
 
 71
 SEITZ, Chief Judge (concurring).
 
 
 72
 I think the panel's opinion can be read to mean that under the circumstances, the district court lacked statutory authority to act on the trustees' petition. Because that inference can be drawn, I desire to make clear that I do not view the appeal and, therefore, this petition for rehearing in banc as presenting a question of the statutory authority of the district court to consider and approve the trustees' petition.
 
 
 73
 In my view Sec. 77(o) gives a trustee authority to file a petition seeking a private sale of any of the debtor's property. It seems to me to follow that the district court has authority to pass on such a petition without first referring it to the ICC as part of a plan of reorganization. This construction is compatible with Secs. 77(d) and (e) because of the requirement in Sec. (o) that the trustee must allege, and of course the district court must find, that such a sale is "in the interest of the debtor's estate and of ultimate reorganization." (emphasis supplied)
 
 
 74
 Given the numerous and varied problems arising in this, and other, reorganizations, a formulation in terms of "lack of authority" is highly undesirable. It removes the flexibility and unnecessarily rigidifies the bounds within which the district court must act. On the other hand, an interpretation which recognizes the "authority" of the district court to act but focuses upon its use of that authority retains the flexibility of the statute while permitting the courts to apply traditional standards in administering it.
 
 
 75
 The issue here then, as I see it, is whether the district court erred in approving the determinations of the trustees that the sales of these properties were: (1) in the interest of the debtor's estate; and (2) in the interest of the ultimate reorganization. In resolving this issue, the district court was called upon to exercise its discretion. In consequence, the court of appeals was required to find an abuse of discretion by the district court before it could reverse.
 
 
 76
 The factors relied upon by the panel of the court form a sound basis for the conclusion that at this stage it was not consistent with a sound exercise of discretion for the district court to approve the trustees' recommendation that the sales were in the interest of the ultimate reorganization of the debtor. I therefore do not seek rehearing in banc.
 
 
 77
 Circuit Judges VAN DUSEN and ALDISERT join in the foregoing opinion.
 
 
 
 [1]
 In the Matter of Penn Central Transportation Company (Sale of Park Avenue Properties), 354 F.Supp. 717 (E.D.Pa. 1972)
 
 
 [2]
 The six properties which the Trustees sought to sell are:
 
 
 [52]
 Vanderbilt Avenue
 
 
 [280]
 Park Avenue West
 
 
 [280]
 Park Avenue East
 
 
 [350]
 Park Avenue
 
 
 [245]
 Park Avenue
 
 
 [230]
 Park Avenue
 Of the six, the Penn Central Transportation Company held a fee interest in 52 Vanderbilt, 280 Park Avenue West and 245 Park Avenue. It held a combination fee and leasehold in 280 Park Avenue East and 230 Park Avenue and a leasehold in 350 Park Avenue.
 
 
 [3]
 Permission was granted as to 52 Vanderbilt Avenue, 280 Park Avenue East, 280 Park Avenue West and 350 Park Avenue; it was denied as to 245 Park Avenue and 230 Park Avenue
 
 
 [4]
 11 U.S.C. Sec. 205(o)
 
 
 [5]
 11 U.S.C. Sec. 205
 
 
 [6]
 The Penn Central Transportation Company held a leasehold on 350 Park Avenue
 
 
 [7]
 The interest is as a tenant in common on 280 Park Avenue East and 230 Park Avenue
 
 
 [8]
 In the Matter of Penn Central Transportation Company, 354 F.Supp. at 749
 
 
 [9]
 See In the Matter of Penn Central Transportation Company (Appeal of Morgan Guaranty Trust Company), 474 F.2d 832 (3rd Cir. 1973); Central R. Co. of New Jersey v. Manufacturers Hanover Trust Co., 421 F.2d 604 (3d Cir.), cert. denied, 398 U.S. 949, 90 S.Ct. 1867, 26 L.Ed.2d 289 (1970)
 
 
 [10]
 See New Haven Inclusion Cases, 399 U.S. 392, 438-440, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970)
 
 
 [11]
 See M. Josephson, The Robber Barons 66-74 (1962 ed.)
 
 
 [12]
 See New York, N.H. & H.R. Co. v. ICC, 60 App.D.C. 403, 55 F.2d 1028, 1030-1031, rev'd on other grounds, 287 U.S. 178, 53 S.Ct. 106, 77 L.Ed. 248 (1932). The issue presented in the 1932 New Haven case was the propriety of the use of mandamus to force the ICC to employ certain evaluation and accounting techniques. The Court of Appeals of the District of Columbia granted the railroad's petition for mandamus; the U. S. Supreme Court reversed. Our utilization of the Court of Appeals' opinion is for its historical information, not its legal holding. In view of this, and considering that the U. S. Supreme Court also recently used the Court of Appeals' opinion for its statement of the history of the New Haven R. Co., New Haven Inclusion Cases, 399 U.S. 392, 439, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970), we do not consider that reliance on the Court of Appeals' opinion for this limited purpose to be inappropriate
 
 
 [13]
 Id., 55 F.2d at 1030
 
 
 [14]
 M. Josephson, supra at 70-72
 
 
 [15]
 Obviously, two of the three were under the complete domination of Commodore Vanderbilt
 
 
 [16]
 New York, N.H. & H.R. Co. v. ICC, 55 F.2d at 1031
 
 
 [17]
 The terms of this lease, important to the resolution of this appeal, will be discussed in some detail. See pp. 334-336 infra
 
 
 [18]
 In the Matter of Penn Central Transportation Company (Sale of Park Avenue Properties), 354 F.Supp. at 731-732
 
 
 [19]
 The disparity of franchise was resolved by a decision that the longer franchise should prevail. M. Josephson, supra at 72-73, n. 7
 
 
 [20]
 Article Tenth, Harlem Lease, Joint Appendix at 997a-9a
 
 
 [21]
 New York, N.H. & H.R. Co. v. ICC, 55 F.2d at 1031
 21a A schematic diagram depicting the complex intercorporate ownership and financing of the Park Avenue Properties is attached as Appendix.
 
 
 [22]
 Despite recurring threats of destruction and "redevelopment," the Grand Central Terminal built pursuant to this agreement remains today, albeit with half of its marble ticket windows now used to receive horse-race bets
 
 
 [23]
 New Haven Inclusion Cases, 399 U.S. at 439, 90 S.Ct. at 2083
 
 
 [24]
 See, e. g., New Haven Inclusion Cases, supra
 
 
 [25]
 Joint Appendix at 779a. (Testimony of Dolman)
 
 
 [26]
 Articles Sixteenth and Seventeenth Harlem Lease-Joint Appendix at 1003-7a
 
 
 [27]
 Article Fifth-Joint Appendix at 993a-4a
 
 
 [28]
 Id
 
 
 [29]
 This mortgage is referred to by the district court as the Harlem 3 1/2% gold mortgage. In the Matter of Penn Central Transportation Company, 354 F.Supp. at 727
 
 
 [30]
 354 F.Supp. at 727
 
 
 [31]
 Id.,
 
 
 [32]
 Id., 354 F.Supp. at 727-729
 
 
 [33]
 Id., 354 F.Supp. at 728
 
 
 [34]
 The Morgan Guaranty Trust Company is trustee under both Harlem mortgages
 
 
 [35]
 In the Matter of Penn Central Transportation Co., 354 F.Supp. at 722
 
 
 [36]
 11 U.S.C. Sec. 205
 
 
 [37]
 In the Matter of Penn Central Transportation Company, 474 F.2d at 833-834
 "After 35 years of Sec. 77, as amended, it is unnecessary to recanvass the two basic objectives of the statute-the conservation of the debtor's assets for the benefit of creditors and the preservation of an ongoing railroad in the public interest. See generally 5 Collier, supra, p 77.02, at 469-470. Central to the statutory objective that the reorganized company should, if at all possible, emerge as a 'living, not a dying . . . enterprise,' Van Schaick v. McCarthy, 10 Cir., 116 F.2d 987, 993, is the understanding that 'a railroad [is] not like an ordinary insolvent estate,' Palmer v. Massachusetts, 308 U.S. at 86 [60 S.Ct. 34] 84 L.Ed. 93. (Footnote omitted)" New Haven Inclusion Cases, 399 U.S. 392, 431 [90 S.Ct. 2054, 2078], 26 L.Ed.2d 691 (1970).
 "While the rights of the bondholders are entitled to respect, they do not command Procrustean measures. They certainly do not dictate that rail operations vital to the Nation be jettisoned despite the availability of a feasible alternative. The public interest is not merely a pawn to be sacrificed for the strategic purposes or protection of a class of security holders whose interests may or may not be served by the destructive move." Penn Central Merger Cases, 389 U.S. 486, 510-511 [88 S.Ct 602, 614] 19 L.Ed.2d 723 (1968) (portion of opinion dealing with New Haven Railroad which was at that time undergoing reorganization.)
 id., n. 3.
 
 
 [38]
 11 U.S.C. Sec. 205(b)
 
 
 [39]
 11 U.S.C. Sec. 205(d)
 
 
 [40]
 11 U.S.C. Sec. 205(e)
 
 
 [41]
 New Haven Inclusion Cases, 399 U.S. at 431-434, 90 S.Ct. 2054 at 2078-2080 (citations omitted)
 
 
 [42]
 11 U.S.C. Sec. 205(o)
 
 
 [43]
 See In the Matter of the Penn Central Transportation Co., 358 F.Supp. 154, 182 (E.D.Pa., filed April 16, 1973)
 
 
 [44]
 A comparison of section 77, dealing with railroad reorganization as it involves prereorganization plan sales of property, with Chapter X of the Bankruptcy Act, 11 U.S.C. Secs. 501-676, dealing with similar provisions of the corporate reorganization section, is illuminating. Both section 77 and Chapter X are bottomed on the concept that through the formulation of a plan, the debtor can be continued in business with its financial problems alleviated
 Section 116(3) of Chapter X, 11 U.S.C. Sec. 516(3), permits the district court to authorize the trustee of a corporation undergoing reorganization to sell any property of the debtor. This power has been deemed sufficiently broad to permit the disposition of all of the debtor's income-producing property, prior to the adoption of a reorganization plan. See 6 Collier, Bankruptcy Sec. 3.27 (14th ed.). Section 77(o) has not been interpreted so broadly.
 The reason for the disparity in treatment, in part, may be attributable to the concerns present in a railroad reorganization but absent in a corporate reorganization, and the place of the reorganization plan in the legislative scheme. Chapter X requires a plan, formulated by the trustee and submitted to the creditors, because the Congress presumably has deemed it better to attempt to resuscitate corporations than to let them be liquidated. This decision indicates a balancing of the interests of the creditors and the debtor. The public interest is served by permitting attempts to reorganize because liquidation is believed more disruptive to the economy than reorganization. Thus, the plan is a product of private individuals and is important to the public to the extent it can produce a viable entity; the public interest is served only when a preservation of the corporation is feasible.
 In the railroad reorganization situation, the public interest is more apparent and more pressing. The public's concern is the preservation of a rail system, an often vital component of the community's or the nation's economic existence. The formulation and adoption of the plan by the ICC required by the statute provides the forum for a full consideration of the public's need for continuing rail service. Thus, the congressional design, requiring public input, might be thwarted if the trustees of a railroad were able to sell a significant portion of the income-producing property prior to the development and implementation of a reorganization plan.
 
 
 [45]
 In the Matter of the Penn Central Transportation Co., 354 F.Supp. at 743
 
 
 [46]
 5 Collier, Bankruptcy Sec. 77.01 (14th ed.)
 
 
 [47]
 St. Joe Paper Co. v. Atlantic Coast Line R. Co., 347 U.S. 298, 303, 74 S.Ct. 574, 577, 98 L.Ed. 710 (1954)
 
 
 [48]
 The district court held that it had the power to permit the sales of all six properties but that its business judgment dictated permitting the sale of but four. Nonetheless, the original proposal was to sell six properties and the Court must view it in that light. Indeed, it might even be contended that the attempt to sell six of the properties is but an aspect of a larger plan to divest the debtor of all of the Park Avenue Properties. Obviously, that problem is not before the Court and the Court will proceed based on an assertion of power by the district court over six properties valued at $60 million
 
 
 [49]
 Memorandum and Order 1137
 
 
 [50]
 Because we hold that these sales may not be authorized by the district judge operating under section 77(o), we do not have to reach the question whether these sales would be in the best interest of the debtors' estate
 
 
 [51]
 Philadelphia Co. v. Dipple, 312 U.S. 168, 61 S.Ct. 538, 85 L.Ed. 651 (1941)
 
 
 [52]
 The Fidelity Bank raises several other arguments in its effort to have the trustees' affirmance reversed. It asserts that there were substantial defaults by the Penn Central requiring disaffirmance, and that because of the domination over the Harlem held by the Penn Central, the Harlem could not effectively exercise its rights under the lease. Our holding that the lease was timely affirmed necessarily rejects these contentions of the Fidelity Bank
 
 
 [53]
 The interest due on the bonds has been paid, making the Harlem bondholders unique among holders of bonds of Central's leased lines, since none of the holders of other bonds have received interest payments. In the Matter of Penn Central Transportation Company, 354 F.Supp. at 735
 
 
 [54]
 117 F.2d 976 (3d Cir. 1941)
 
 
 [55]
 See text accompanying note 24, supra
 
 
 [56]
 In the Matter of the Penn Central Transportation Company, 354 F.Supp. at 745-746
 
 
 [57]
 Panama Refining Co. v. Ryan, 293 U.S. 388, 439, 55 S.Ct. 241, 256, 79 L.Ed. 446 (1935) (Cardozo, J., dissenting)